**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
|     Plaintiff, and | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CONTRICE TRAVIS, | ) | |
|     Plaintiff-Intervenor, | ) | CIVIL ACTION FILE NO. |
| | ) | 1:10-CV-03132-SCJ-ECS |
| v. | ) | |
| | ) | |
| EXEL, INC., | ) | |
|     Defendant. | ) | |

**PLAINTIFF-INTERVENOR'S RESPONSE TO**
**DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR,**
**ALTERNATIVLY, FOR A NEW TRIAL**

Respectfully submitted this 9th day of August, 2013.

/s/ Rudjard M. Hayes
Rudjard M. Hayes
Georgia Bar No. 340329
/s/ Joan M. McCallum
Joan M. McCallum
Georgia Bar No. 770274
SANCHEZ HAYES & ASSOCIATES, LLC
1015 Tyrone Road, Suite 620
Tyrone, Georgia 30290
*COUNSEL FOR PLAINTIFF-INTERVENOR*

## **TABLE OF CONTENTS**

I. INTRODUCTION _____ 1

II. FACTS ESTABLISHED AT TRIAL_____ 2

   A. Exel and the PPG Facilities_____ 1

   B. Travis' Hire at Exel _____ 3

   C. Dave Harris becomes the General Manager of the PPG Facility_____ 4

   D. Harris creates the Inventory Supervisor Position _____ 5

   E. Travis is Denied a Promotion to Supervisor in June, 2008 _____ 6

      1. Teal is Promoted to Operations Manager & Harris Informs Teal he will
         Not Hire a Female to Fill Teal's Vacated Position _____ 6

      2. Travis Applies for, and is Denied, the Supervisor Position Vacated by
         Teal _____ 7

   F. Pooler was Promoted to the Supervisor Position Denied to Travis _____ 8

      1. Pooler is offered the Inventory Supervisor Position Vacated by Teal on
         the Condition that Pooler Keeps his Promotion Quiet_____ 8

      2. Pooler is the Inventory Supervisor at the PPG Facility until his
         Termination in January, 2009 _____ 10

   G. Exel's Alleged Preferential Transfer Practice _____ 11

   H. Travis Presented Ample Evidence of Pretext _____ 12

      1. Exel Failed to Comply with the Alleged PT Practice _____ 12

      2. Exel's PT Practice did Not Preclude Travis' Promotion to Inventory
         Supervisor _____ 13

      3. Travis' Alleged Attendance Issues Did Not Affect her Ability to be
         Promoted _____ 14

      4. Harris' Comments and Actions Evincing Animus_____ 14

      i.    Harris made numerous comments showing his gender bias _____ 14

     ii.    Harris failed and refused to select a single female for any supervisor or manager positions during his time at the PPG facility ___ 15

    iii.    Harris' attitudes and actions at the workplace evinced his bias against females _____ 16

  5.  Priro Promotional Opportunities Denied to Travis _____ 17

  6.  Exel Ignored Travis' Numerous Complaints about Harris' Discriminatory Actions_____ 18

III. ARGUMENT AND CITATION TO AUTHORITY _____ 20

  A. Exel is Not entitled to Judgment as a Matter of Law _____ 20

    1.  Travis Presented Sufficient Evidence to Support her Prima Facie Case of Discrimination _____ 22

        i.    Travis qualified for the 2008 Supervisor Position _____ 23

       ii.    Travis applied for the 2008 Supervisor Position _____ 24

      iii.    Harris Rejected Travis and Selected a Male (Pooler) Without Regard to Travis' Qualifications _____ 25

    2.  Travis Presented substantial Evidence that Exel's Proffered Reasons for the Denial of Her Promotion were Mere Pretext _____ 26

        i.    Harris' Comments are Direct Evidence of Pretext_____ 26

       ii.    The Veracity of Exel's Proffered Reasons is in Genuine Dispute ____ 27

      iii.    The Totality of the Circumstances shows that Exel's Proffered Reasons are Unworthy of Credence_____ 29

  B. Exel is Not Entitled to a New Trial_____ 31

  C. Travis Presented Sufficient Evidence for Compensatory Damages to be Awarded _____ 32

D. Punitive Damages Were Appropriatly Awarded by the Jury _____ 33

   1. Exel had Actual Notice of Harris' Discriminatory Actions _____ 33

   2. Exel had Constructive Notice of Harris' Discriminatory Actions _____ 35

      i. Travis Presented Substantial Evidence of Malice and/or Recklessness on the part of Exel _____ 35

     ii. Harris, Hudson, and Phillips are sufficiently high up the Corporate Hierarchy at Exel to Impute Liability to the Company _____ 36

        a. Exel waived its right to assert the decision makers were not sufficiently high up the corporate hierarchy_____ 36

        b. Harris Discrimnated against Travis with the Countenance and Approval of Hudson and Phillips_____ 37

   3. The Kolstad Defense does not Apply as Exel did Not Make a Good-Faith Effort to Comport with the Law _____ 38

E. The Punitive Damage Award Should Stand as it is Not Execssive_____ 40

   1. Exel's Actions Evince a High Degree of Reprehensibility _____ 41

   2. The Ratio of Punitive to Other Damages is Reasonable Given the Award of Compensatory Damages and the Size of Exel_____ 42

IV. CONCLUSION_____ 44

# I.  INTRODUCTION

Plaintiff-Intervenor, Contrice Travis ("Travis"), submits this Response[1] in Opposition to Defendant Exel Inc.'s ("Exel") Motion for Judgment as a Matter of Law and in the Alternative a Motion for New Trial ("Motion") pursuant to Fed. R. Civ. P. 50 & 59, demonstrating to this Court that sufficient facts were presented for a reasonable jury to find for Plaintiff and that the verdict rendered was not against the great weight of the evidence, and therefore, Exel's Motion should be **DENIED**.

## II. FACTS ESTABLISHED AT TRIAL

### A.    Exel and the PPG Facilities

Exel, Inc. ("Exel" or the "Company") is a large supply chain management corporation that provides logistic solutions, including warehouse and distribution services, to various customers throughout the United States and Canada. (Tr. 397).[2] During the relevant time period, Exel's annual revenue was more than $4.8 Billion Dollars and the Company employed more than 500 employees in each of twenty or more calendar weeks in 2007 and 2008. (Tr. 398).

---

[1] For the Court's convenience, trial citations referenced herein will be in the same format as those presented by Defendant: Plaintiff's trial exhibits are cited as "PX" and Defendant's trail exhibits are cited as "DX." The trial transcript will be cited by the testifying witness' initials (when appropriate) followed by the page and line number(s). The corresponding witnesses include: CT = Contrice Travis; DH = Dave Harris; KT = James Kenny Teal; MP = Michel Pooler; DC = Donald Crankshaw; FH = Franklin Hudson; TC = Tommy Chambers; MM = Marie Murphy; LG = Lisa Guydon.

[2] Unless noted otherwise, the facts relate to the time period of 2007 to 2009.

Exel operated approximately ten distribution facilities in Fairburn, Georgia, one of which was the facility responsible for providing logistic solutions to Pittsburg Paint and Glass (the "PPG facility"). (Tr. 397; CT 110:10-16). Exel also operates two other facilities that service PPG, one in Fontana, California (the "Fontana facility") and one in Harrisburg, Pennsylvania (the "Harrisburg facility"). (DH 340:11-15, 514:16-515:7).

The highest ranking Exel employee at the PPG facility was the General Manager (the "GM"). (CT 111:12-14; DH 343:16-18). Exel has three levels of General Managers, titled "GM I," "GM II," and "GM III." (LG 446:20-447:1). The GM's with responsibility over larger facilities with greater revenue are designated GM I's; GM II's and GM III's are assigned to respectively smaller facilities. Id. The GM at the PPG Facility – *specifically, Dave Harris ("Harris")* – was a **GM I**. (Id.; DH 366:11-14). Additionally, the GM at the PPG facility acted as the hiring manager with ultimate and final decision making authority for all hiring, promotions, and terminations at the PPG facility.[3]

The PPG facility had one Operations Manager (the "OM") who reported directly to the GM. (CT 111:23-112:1; see also LG 446-447; DH 474, 476). Three (3) Supervisors reported directly to the OM. (DH 474:6-10). "Leads," including positions titled as leads, taskers, and/or coordinators, reported to the Supervisors.[4] Finally, below the Leads were more than fifty (50) various other hourly workers. (Id.; KT 208:11-22).

---

[3] FH 417:6-11, 423:10-14; LG 453:16-18, 466:17-24; DH 474:18-22, 479:4-11.
[4] CT 112:10-19; FH 413:6-17, 414:2-5, 414:17-415:2.

**B.**   **Travis' Hire at Exel**

Travis was hired by Exel in or around November, 2005, as a tasker at the PPG facility. (CT 109:4-12, 112:23-25; TC 291:13-17). In or around 2006, the previous GM of the PPG facility, Bob Brown ("Brown"), made Travis the Inventory Lead. (CT 111:15-113:22). As Inventory Lead, Travis initially reported to the customer on-site, Joe Gezo; however, as more fully explained below, from June, 2007, through the time of her resignation Travis reported directly to the Inventory Supervisor. (CT 114:5-8, 116:15-22). Travis was responsible for maintaining PPG's inventory, ensuring the customer's product was properly stocked and correctly recorded in Exel's inventory management programs. (CT 112:23-113:20). Travis was also responsible for all purchase orders, receiving and processing damaged product, and responding to any and all inventory matters of importance to PPG. (Id.).

Throughout her tenure, Harris[5] ordered Travis to train numerous supervisors, and managers in inventory management at the PPG facility, and the Fontana facility.[6] In addition to providing training, Travis also filled in for supervisors and managers at the PPG facility and the Fontana facility when such positions were temporarily vacated.[7]

---

[5] CT 116:8-14, 155:21-156:6, 185:18-186:6.
[6] CT 115:18-21, 179:14-182:2; KT 245:9-10; TC 291:21-292:2. (Travis trained: Operations Managers Tommy Chambers and Dan Bair; and Supervisors Teal, Sawyer, Russell, Pooler, and Dave DuPont).
[7] CT 116:8-14, 171:15-172:4, 185:18-186:6; KT 214:22-215:7; TC 291:21-292:8.

3

Specifically, Travis served as the OM at the Fontana facility for two (2) weeks until a male was hired to fill the position. (CT 116:8-14, 185:18-186:6). Travis also served as a Supervisor at the PPG facility for approximately four (4) weeks when the position was vacated by Calvin Sawyer ("Sawyer") until the position was ultimately filled by James Russell ("Russell") (male). (Id.; 171:15-172:4). Travis again served as a Supervisor when Russell went on medical leave for an extended period of time. (KT 214:22-215:4). Additionally, Travis filled in for supervisors at the PPG facility whenever supervisors were out on vacation or sick leave. (TC 291:21-292:20). Notably, Travis was regularly required to fill in for management because she did an *"outstanding"* job, *"was capable of getting the job done,"* and *"performed better than the supervisors."* (Id.).

## C.    Dave Harris becomes the General Manager of the PPG Facility

Harris was hired by Exel in or around May, 2006, as the OM at the PPG facility.[8] (DH 339:20-24). In or around late 2006 or early 2007, Brown left Exel and Harris was promoted from OM to the GM I position vacated by Brown. (CT 111:18-24; DH 340:3-5, 341:23-25, 473:18-20). ***Harris did not submit a written application*** for the GM position; rather, Harris simply "made it known" that he wanted the job, was considered for the position, and was promoted. (DH 522:6-15). As the GM, Harris was the highest ranking Exel employee at the PPG facility, had complete authority to hire and/or promote

---

[8] Notably, Harris is still employed by Exel as a GM I. (DH 338:19-24; 366:11-14).

employees at the PPG facility and "complete responsibility for the functioning of the PPG facility." (DH 244:9-16; 343:16-18). Notably, Harris was not only a **GM I**, but also a "**Network Manager**" in charge of Exel's facilities servicing PPG in Georgia, California, and Pennsylvania. (DH 340:11-15, 366:11-14, 514:16-515:17). As a GM and Network Manager, Harris reported directly to Exel's Director of Operations[9]

### D.   Harris creates the Inventory Supervisor Position

In or around June, 2007, the organizational structure was changed at the PPG facility.[10]   Prior to June, 2007, the PPG facility had one supervisor over each of the three (3) working shifts, with all three supervisors titled "Operations Supervisor." Id. Thereafter, the facility had two (2) Operations Supervisors, with responsibilities over first and second shift, and one (1) **"Inventory Supervisor"** responsible for inventory management at the facility. Id. The lesser-staffed third shift was run by two leads. Id.

In June, 2007, Travis was informed by Supervisor Donald Crankshaw ("Crankshaw") of the newly created Inventory Supervisor position. (CT 116:23-117:7). Travis immediately went to Harris' office and applied for the Inventory Supervisor position, telling Harris that she wanted the position. (CT 117:8-11, 174:23-175:4). Harris direct response to Travis' applications was, ***"no. That doesn't exist. We don't even have such a position."*** (Id.).

---

[9]   During the relevant times, Exel's Directors of Operation was Tom McKenna who was later replaced by Mark Phillips. (DH 523:1-8, 489:23-11).

[10] CT 195:11-22, 196:7-9; KT 221:19-21, 243:6-8, 244:15-25; see also DH 369:1-10.

Less than one (1) week after Harris' told Travis the Inventory Supervisor position ***"doesn't exist,"*** Harris announced to the PPG facility that former Operations Supervisor, James Teal ("Teal"),[11] was the facility's new Inventory Supervisor.[12] Notably, Teal **did not submit an application** for his transfer from Operations Supervisor to Inventory Supervisor; rather, Harris simply approached Teal and offered him the position. (KT 209:10-210:1).

After becoming the Inventory Supervisor, Teal's job duties and responsibilities were greatly changed. (CT 119:2-13; KT 210:2-211:8). Teal went from supervising an entire shift of fifty (50) associates to supervising only the Inventory Lead, Travis. (Id.). Additionally, Teal went from managing the daily operations to being "in control of the inventory only." (KT 210:2-10).

### E.   Travis is Denied a Promotion to Supervisor in June, 2008

#### 1.   *Teal is Promoted to Operations Manager & Harris Informs Teal he Will Not Hire a Female to Fill Teal's Vacated Position*

Teal maintained his position as Inventory Supervisor until in or around June, 2008, when he was promoted by Harris to the position of OM. (CT 128:17-22, 196:9-16; KT 212:2-7; DH 346:23-25). Again, **Teal did not submit a written application** for his

---

[11] Notably, Teal was initially hired by Exel in 2003 as a picker. (KT 207:8-14). **Teal did not submit an application of any kind for his promotion from hourly employee to Operations Supervisor in or around March, 2005.** (KT 207:20-208:10, 222:4-23).

[12] (CT 116:20-22, 118:2-119:1, 196:7-11; KT 208:18-22, 209:2-7; see also DH 346:10-22).

promotion to OM; rather, Teal merely told Harris he was interested in the OM position and Harris promoted him. (KT 212:8-20). Following his promotion, Teal asked Harris to consider Travis for the open Inventory Supervisor position. (KT 216:6-18, 236:9-17, 237:6-11, 237:19-238:1, 246:13-20). In response to Teal's suggestion, Teal testified that Harris responded as follows:

> A: **When the Inventory Control Supervisor's position became available, when I moved into the OM's position, I mentioned to Mr. Harris that Contrice [Travis] should have the job.**

> Q: And what did he [Harris] tell you?

> A: He told me that he felt she wasn't qualified and that the best I can remember **he said that he would not put a woman in a management position.**

> **Q: He told you he wouldn't put a woman in that position?**

> **A: Yes.**

(KT 216:6-18 (emphasis added)). Teal testified that Harris made the comment that he **"wouldn't put a woman in a management position"** on more than one occasion. (KT 216: 25-217:5; 253:11-14).

### 2. *Travis Applies for and is Denied the Supervisor Position Vacated by Teal*

Travis was made aware of Teal's promotion when Harris announced – both orally and in writing – that Teal was the new OM of the PPG facility. (CT 128:23-129:6, PX 9). Notably, in Harris' announcement of Teal's promotion to OM, Harris acknowledged Teal's rise through the management ranks including the position of **"inventory management supervisor."** (Id.). Immediately after discovering Teal's promotion and the

7

vacancy of the Inventory Supervisor position, Travis applied for the position, telling Harris that she wanted to be the new Inventory Supervisor. (CT 129:7-22, 137:19-138:14, 178:3-10). **Harris admitted** that: he met with Travis following Teal's promotion; discussed the supervisor job opening with her; and Travis told Harris "she would like to be the Inventory Supervisor." (DH 347:14-18, 349:22-25; 526:1-6).

In response to Travis' application to the Inventory Supervisor position, Harris told Travis, **"I'm never going to do it."** (CT 129:23-130:3, 138:12-20, 139:3-5). Moreover, Harris also **admitted** that he *discouraged Travis from applying*. (DH 347:14-18, 349:22-25, 350:1-4, 351:4-8, 354:17-20). Travis attempted to locate the Inventory Supervisor position online, but no such position was posted by Harris. (CT 130:15-21). Rather, Harris posted an opening for an Operations Supervisor position. (DH 481:11-12, PX 26).[13] Harris' posting was approved by the Company's Human Resources Department. (FH 418:15-22; LG 452:6-24; DH 480:9-25, 481:4-14, 487:14-15, 488:22-23, Def. Ex 2). Harris admittedly "*did not even consider*" Travis for the promotion to the supervisor position in June, 2008. (DH 370:8-15, 494:15-17).

### F.    Pooler was Promoted to the Supervisor Position Denied to Travis

####    1.    *Pooler is offered the Inventory Supervisor Position Vacated by Teal on the Condition that Pooler Keeps his Promotion Quiet.*

---

[13] As explained below, Harris did *not* hire an Operations Supervisor in June, 2008; rather, Harris hired Michel Pooler as Inventory Supervisor in June, 2008, to replace the outgoing Inventory Supervisor, Teal. (KT 212:24-213:6; MP 324:20-23). Accordingly, there is absolutely no evidence that Exel formally posted the position at issue in this action.

At the time of Teal's promotion to OM, Michel Pooler ("Pooler") was employed by Exel as a Quality Coordinator at the Company's facility which serviced Hawaiian Tropics (the "HT facility"). (MP 324:1-13, 336:1-5). Notably, as a "Coordinator" Pooler was in a *lead* position, *not* a supervisor position.[14] The GM of the HT facility at the time of Pooler's promotion/transfer was Mike Blose ("Blose"). (MP 324:14-19).

In or around June, 2008, at the time of Teal's promotion, Pooler was called in on a Saturday to meet with Human Resources Director Franklin Hudson ("Hudson") and GM Blose.[15] During this meeting Hudson and/or Blose told Pooler that his position at the HT facility was being eliminated but "***not to speak to anyone about anything,*** don't make any phone calls because there is an ***inventory position*** becoming available at the PPG account," specifically "an ***Inventory Supervisor*** position."[16] Pooler further testified that Hudson's and Blose's demands that he "keep quiet" "[were] ***more threatening [than] anything***…he [Blose] actually did say, ***if you tell anyone it's out of the question, the position will not be available***." (MP 334:4-8). Notably, **Pooler did not submit an application or submit a resume** for the June, 2008, Supervisor position at the PPG facility. (MP 328:6-10; FH 407:1-8).

Hudson then referred Pooler to Harris, who ultimately selected Pooler for the position of Inventory Supervisor in or around July, 2008, without considering Travis for

---

[14] FH 413:6-17, 414:2-5, 414:17-415:2; MP 336:1-5.
[15] (MP 324:25-325:12, 327:18-328:5; FH 403:18-22, 408:18-409:3).
[16] MP 324:35-325:12, 327:21-328:5, 329:14-19, 333:18-334:8.

the position.[17] **Harris admitted** that he decided to hire Pooler after discussing the same with Exel's Director of Operations, Mark Phillips ("Phillips"), and Pooler's former GM, Blose. (DH 489:23-11).

  **2.** *Pooler is the Inventory Supervisor at the PPG Facility until his Termination in January, 2009*

Pooler was undeniably brought to the PPG facility to fill the Inventory Supervisor position vacated by Teal. (KT 212:24-213:6; MP 324:20-23). Harris initially promoted Pooler to an "Operations Supervisor" position over first shift, but Pooler held that position for *no more than four (4) days* when Harris moved Pooler over second shift. (MP 325:5-326:23). Despite his alleged "Operations Supervisor" title initially following his transfer to the PPG facility, Pooler had only a single direct report (Inventory Lead, Travis) while employed at the PPG facility. (KT 213:11-19; MP 330:17-22, 332:4-6).

While functioning as an alleged "Operations Supervisor," Harris instructed Pooler to train with Travis in inventory; indeed, Pooler testified that **"all of my training came from [Travis]."**[18] Travis continued to train Pooler for a minimum of two (2) weeks in inventory management. (CT 131:10-12). The training Travis provided to Pooler was much different than the training she previously provided to other supervisors and managers. (CT 131:13-21). Travis did not merely train Pooler on how to view and research inventory issues as she had trained other Supervisors before; rather she trained

---

[17] DH 361:4-14, 361:25-362:3, 362: 4-21, 370:8-15, 494:15-17; KT 213:24-25.
[18] (MP 325:5-326:23, 331:7-15; see also CT 138:4-6; DH 507:4-5).

Pooler for an extensive amount of time showing him "everything [she] knew about inventory." (Id.; 180:8-25). Additionally, Pooler performed the same duties and responsibilities as Teal had performed as Inventory Supervisor.[19]

After training Pooler, Travis provided Exel with her two weeks' notice (CT 131:22-24). Travis' last day of employment with Exel was on or about July 31, 2008.[20] Immediately following Travis' resignation, Harris explicitly informed Pooler that his job title was **"Inventory Supervisor."** (MP 325:5-326:23, 331:13-15). Harris admittedly referred to Pooler as the "Inventory Supervisor." (DH 356:18-21, 357:11-13, PX 40).

On or about September 9, 2008, Travis filed her complaint of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). (CT 183:8-11; see also 193:16-24). One (1) week after Exel received notice of Travis' charge of sex discrimination, Pooler was laid-off by Exel and notified by Harris that his position, **"Inventory Supervisor,"** was eliminated. (DH 520:25-521:9, PX 40).[21]

### G.   Exel's Alleged Preferential Transfer Practice

Exel presented testimony that the Company used an alleged Preferential Transfer Practice (the "PT Practice") to ensure employees selected for layoff at Exel's closing facilities were given priority for hire at positions in other Exel facilities. (LG 469:10-17).

---

[19] (KT 213:7-10; DC 266:18-21, 272:7-14).

[20] (CT 132:20-21; 134:1-23; 142:16-144:10).

[21] Notably, Crankshaw replaced Pooler after Pooler's termination and was referred to by his Operations Manager, Dan Bair, as the "Inventory Control Supervisor." (DC 268:11-23, 270:3-5, PX 22-23).

However, the alleged PT Practice is not documented in any form by the Company, and Teal testified that he was not even aware of the existence of any such practice. (LG 465:23-466:6; KT 214:1-7). As more fully explained below, even if Exel proffered a sufficient amount of evidence that this alleged PT Practice existed, Travis presented substantial evidence that the Practice was not followed with respect to Pooler's promotion in June, 2008.[22]

## H.    Travis Presented Ample Evidence of Pretext

### 1.    *Exel Failed to Comply with the Alleged PT Practice*

When an employee seeks a transfer or promotion within Exel, the internal candidate informs his/her supervisor that he/she wishes to be considered for the position at issue.[23] The supervisor informs Human Resources of the candidate's application to determine if the internal candidate meets the minimum qualifications. (FH 403:12-15). If so, Human Resources presents the employee to the hiring manager who makes the ultimate decision to select (or not select) the internal candidate. (FH 403:16-17).

Under the PT Practice, if an Exel employee is about to be laid-off from their facility, Human Resources locates positions available at other Exel facilities that the laid-off employee qualifies for. (FH 407:10-15). The laid-off employee is then given "preference" for the available position. (Id.). Both Hudson and Crankshaw testified that it

_____

[22] See facts in the subsection immediately below titled "Exel Failed to Comply with the Alleged PT Practice".

[23] See DH 522:6-15; KT 207:20-25, 208:5-10, 212:8-12, 222:4-23; MP 328:6-10; FH 399:14-18, 407:1-8.

is contrary to this PT Practice for a position offered to a laid-off employee to be conditioned on the employee keeping the transfer secret. (FH 409:10-15; DC 278:22-25). Notably, as discussed above, Pooler's promotion to the Inventory Supervisor position at the PPG facility was conditioned on his silence and his ability to keep the promotion "quiet." (MP 324:35-325:12, 327:21-328:5, 329:14-19, 333:18-334:8).

2. *Exel's PT Practice did not Preclude Travis' Promotion to Inventory Supervisor*

Regardless of the existence of the alleged PT Practice, this practice is nothing more than a red herring as Travis was already denied the position at issue before Harris was even aware there was a PT Practice candidate to consider.[24] Moreover, the promotion of Travis would not have hindered the transfer of Pooler to the PPG facility.

Specifically, Harris (the hiring manager), HR Director Hudson, and HR Manager Guydon, admitted that Travis could have been promoted to the Inventory Supervisor position, vacating the Inventory Lead position; thereafter, Pooler could have been laterally transferred from Quality Coordinator, *a lead-level position*, to the Inventory Lead position at the PPG facility.[25] Harris had the authority and ability to so promote Travis and laterally transfer Pooler. (DH 524:8-525:19). However, Harris admittedly *did not consider* Travis for the Supervisor position, and *promoted* Pooler to the Inventory

---

[24] See CT 129:23-130:3, 138:12-20, 139:3-5; DH 347:14-18, 349:22-25, 350:1-4, 351:4-8, 354:17-20 (showing Travis was denied the promotion immediately upon her notification to Harris that she was applying for the position at issue).

[25] (FH 426:7-12; LG 470:24-471:19; DH 524:8-525:19).

Supervisor position despite the fact that Travis was "*a hundred percent*" *more qualified* for the position than Pooler.[26]

### 3. Travis' Alleged Attendance Issues Did Not Affect her Ability to be Promoted

Multiple supervisors and managers testified that Travis was eligible for promotion to a supervisor position.[27] Moreover, Travis' supervisors all testified that Travis had no performance issues and was an exceptional employee.[28] Both Harris and Teal admitted that Travis' attendance issues *did not* disqualify Travis from being promoted to Supervisor. (KT 211:16-21; DH 359:25-360:4). Additionally, Crankshaw testified he had similar attendance issues as Travis immediately prior to his promotion from hourly-employee to Supervisor, and those attendance policy violations *did not affect his eligibility for promotion*. (DC 263:19-264:7, PX 20).

### 4. Harris' Comments and Actions Evincing Animus

#### i. **Harris' made numerous comments showing his gender bias**

As addressed above, Harris commented to Teal on more than one occasion that he *"wouldn't put a woman in a management position."* (KT 216: 25-217:5; 253:11-14). Teal clarified repeatedly that, although he couldn't recall the exact date of Harris'

---

[26]  DH 362:22-25, 370:8-15, 372:15-17, 494:15-17, 524:8-525:19; MP 331:24-332:3, 334:16-18 (showing that Harris testified not only that Travis was *"a hundred percent more qualified ... for the inventory position"* than Pooler, but also that Travis knew the position better than anyone else who was asking to be promoted).
[27] (KT 211:12-15; TC 292:21-293:13; DH:497:4-10).
[28]  KT 211:16-21, 215:10-11; TC 292:14-20; see also DH 362:22-25, 372:15-17; DC 266:2-10.

comment, he clearly remembered the context of the conversation – Teal's suggestion that Harris select Travis for the Inventory Supervisor position at issue immediately following Teal's promotion to OM.[29]

Harris informed Travis that he was never going to promote her when she asked to be selected for the Supervisor position at issue. (CT 129:23-130:3, 138:12-20, 139:3-5). Specifically, Harris told Travis, ***"I'm not going to do it. I can't, I'm not going to do it. I won't do it."*** (CT 139:3-5). Harris also told Travis that he wanted Travis to ***"manage the ladies in the office."*** (CT 181:11-18; 192:24-193:1). Harris' comments to Travis and Teal all occurred in the time period between Teal's promotion to OM in June, 2008, and Harris' refusal to promote Travis to the vacated Inventory Supervisor position. (Id.).

### ii. Harris failed and refused to select a single female for any supervisor or manager position during his time at the PPG facility

During Harris' tenure at the PPG facility Harris transferred and/or promoted individuals to supervisor or manager positions on at least five (5) occasions.[30] Specifically, Harris promoted and/or transferred the following individuals in 2007 and 2008:

1. Harris transferred and promoted Chambers from Supervisor at another Exel facility to OM at the PPG facility in 2007. (TC 290:9-25; DH 366:17-25).

2. Harris transferred Sawyer into an Operations Supervisor position at the PPG facility in February, 2007. (DH 477:12-19).

---

[29] KT 216:6-18, 236:9-17; 237:6-238:1; 239:6-11; see also KT 246:13-20.
[30] CT:128:17-22; KT 212:2-20, 212:24-213:4; TC 290:9-25; MP 325:5-326:23, 336:1-5; DH 346:23-25, 366:17-25, 367:19-21, 477:12-19, 478:4-13, 479:1-8, 486:6-14, DX 10.

3.  Harris transferred Russell into an Operations Supervisor position at the PPG facility in April, 2008. (DH 478:4-13, 486:6-14, DX 10).

4.  Harris promoted Teal from Inventory Supervisor to OM in 2008. (CT 128:17-22; KT 212:2-20; DH 346:23-25, 367:19-21).

5.  Harris transferred and promoted Pooler from Quality Coordinator at the HT facility to Inventory Supervisor at the PPG facility in June, 2008. (MP 325:5-236:23; 336:1-5; KT 212:24-213:4; DH 479:1-8).

Notably, each and every time Harris filled a supervisor or management position at the PPG facility, he selected a male.[31] Moreover, during Harris' tenure at the PPG facility, there were ***no females*** in any supervisor or manager positions.[32] Rather, Harris had Travis act as a Supervisor or Manager at the PPG and Fontana facilities when positions were temporarily vacated, but would ultimately select a male to permanently fill the position without considering Travis for the promotion.[33]

### iii.  Harris' attitudes and actions at the workplace evinced his bias against females

Chambers testified that Harris was ***"standoffish towards females, even the ones that were his direct reports;"*** moreover, Harris was specifically reticent with respect to Travis.[34] Harris often ***"wouldn't speak to"*** female employees and would direct Chambers to address issues raised by female employees. (TC 299:1-6; see also CT 161:3-5, 123:20-

---

[31] CT:128:17-22; KT 212:2-20, 212:24-213:4; TC 290:9-25; MP 325:5-326:23, 336:1-5; DH 346:23-25, 366:17-25, 367:19-21, 477:12-19, 478:4-13, 479:1-8, 486:6-14, DX 10.
[32] CT 196:21-23; LG 462:6-8; DC 273:13-274:3; KT 251:2-252:5; DH 345:10-17, 370:16-18.
[33] CT 116:8-14, 119:13-120:11, 185:18-186:6; 171:15-172:4; KT 214:22-215:7, 216:6-8, 236:9-17, 237:6-238:1; TC 291:21-292:8, 292:13-20; DH 370:8-15, 494:15-17.
[34] TC 295:14-90; 298:17-25; CT 161:3-5, 122:23-123:12, 123:30-124:3.

124:3). Both Teal and Chambers testified that Harris' comments, actions, and attitude, coupled with the lack of females in management, led them to believe Harris denied Travis promotional opportunities *because she was female*. (KT 218:5-16; TC 294:25-295:24). Indeed, when Travis complained about Harris to Chambers, Chambers instructed Travis to seek employment outside of the Company as he did not believe Harris would promote Travis *because of her gender*. (Id.).

### 5. Prior Promotional Opportunities Denied to Travis[35]

In addition to being denied a promotion in June, 2008, Travis also presented ample evidence that she was denied promotional opportunities in both February, 2007, as well as in April, 2008.[36] At the times identified above, Supervisor positions at the PPG facility came available and, on each occasion, Travis spoke with Harris and applied for the open Supervisor positions. (CT 119:14-20, 120:20-21). However, on each occasion, Harris responded that Travis was not qualified for the Supervisor position because she lacked a college degree or didn't have the requisite experience. (CT 119:17-25). Notably, Harris admitted at trial that a college degree is *not required* for a Supervisor position at Exel. (DH 497:7-10; see also KT 220:21-23; DC 273:9-12). As addressed above, Travis filled in for vacated supervisor and manager positions temporarily until Harris ultimately

---

[35] While Travis does not assert a claim for any promotions she was denied prior to June, 2008, such denials can act as circumstantial evidence of discriminatory animus and are relevant to his action. See Myers v. Central Florida Investments, Inc., 592 F.3d 1201, 1220 (11th Cir. 2010).

[36] (See CT 119:14-20; DH 477:12-19, 478:4-13, 486:6-14, DX 10).

selected males – Bair, Sawyer and Russell – to fill the open positions. (DH 477:12-19, 478:4-13, 486:6-14, DX 10).

### 6. *Exel Ignored Travis' Numerous Complaints about Harris' Discriminatory Actions*

Exel's alleged anti-discrimination policy allows an employee to bring a complaint to her supervisor, the facility manager, or a human resources representative. (LG 303:25-304:2, 306:10-12). Travis put Exel on **actual notice**[37] when she complained about Harris' discriminatory actions on countless occasions to her supervisors Teal and Chambers, as well as to Exel's Human Resources Managers Marie Murphy ("Murphy") and Hudson. (CT 121:25-122:7).

Travis complained to Murphy on multiple occasions, with her latest complaint being made in **July, 2008**. (CT 147:21-23, 150:11-13; MM 441:22-26). Travis spoke with Murphy in the Human Resources office and discussed the issues she had with Harris, including how she ***"felt that [Harris] was not willing to work with me or give me the opportunity to be a supervisor on any level because I felt like, I was female…I told her I felt like [Harris] was treating me that way because I was female."*** (CT 122:13-22, 124:20-22). Travis explained to Murphy that she felt Harris discriminated against her on the basis of her gender because of the comments he made to her, his refusal to work

---

[37] See Breda v. Wolf Camera & Video, 222 F.3d 866, 899-890 (11th Cir. 2000) (finding that notice to a designated person under the employer's anti-discrimination policy constituted ***actual***, not merely constructive, notice to the employer).

directly with female employees, and his actions in ignoring her concerns and the concerns of other female employees. (CT 122:23-124:3). In response to Travis' complaint, Murphy told Travis "that she understood… [Murphy] felt like she had experienced the same thing." (CT 124:23-125:4). However, Murphy refused to initiate an investigation of Travis' complaints; indeed the only action Murphy took in response to Travis' complaints was instructing Travis to bring her concerns to Hudson's attention. (CT 125:5-14).[38]

Accordingly, Travis brought her complaints to Hudson in 2008. (CT 127:1-3, 148:3-4, 149:16-17). Travis told Hudson the same information she relayed to Murphy regarding Harris' discriminating behavior. (CT 127:4-6, 148:9-18). Specifically, Travis told Hudson ***"I felt like I had been overlooked for promotions and had not received increases in pay and received more work. And I felt like part of the reason was because I was a woman."*** (CT 148:19-2). Hudson responded to Travis' complaints by instructing Travis to ***"look into transferring to another site."*** (CT 127:4-20). Again, Travis' complaints went without any answer or investigation from the Company's Human Resources department. (Id.). When Travis similarly complained to Chambers, Chambers also instructed Travis to seek employment elsewhere because Travis would likely never be promoted under Harris due to her gender. (TC 294:14-295:24).

---

[38] Notably, Murphy's failure and refusal to initiate an investigation of Travis' complaints of discrimination was a violation of the Company's alleged anti-discrimination policies regardless of whether or not Murphy was specifically assigned to the PPG facility. (LG 462:22-463:3, 464:9-17).

Thus, the only response the Company had to Travis' serious complaints of sex discrimination was that Travis would have to resign from Exel if she ever wanted to be considered for a promotional opportunity. (CT 127:4-20; TC 294:14-295:24). Accordingly, after being denied a promotion under Harris for the third time in June, 2008, Travis resigned her employment with Exel. (CT 190:22-191:8, 132:20-25). Travis then filed her initial claim with the EEOC on or about September 9, 2008. (CT 183:8-11). The EEOC determined there was sufficient evidence to support a probable cause finding that Exel unlawfully discriminated against Travis on the basis of her gender and the EEOC and Travis subsequently filed this action.

## III.  ARGUMENT AND CITATION TO AUTHORITY

### A.    Exel is Not entitled to Judgment as a Matter of Law

The standard for granting Judgment as a Matter of Law ("JMOL" or a directed verdict) and Summary Judgment is the same;[39] the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson et al. v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). This inquiry should be made with all of the evidenced reviewed "in the light most favorable to, and with all reasonable inferences

---

[39] Reeves v. Sanderson Plumbing Products, Inc.,  530 U.S. 133, 150 (2000).

drawn in favor of the nonmoving party."[40] Moreover, the reviewing judge "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 503 U.S. at 151.

That is to say, "if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions" then a motion for JMOL should be **denied**.[41] A motion for directed verdict should **not** be used to decide "who has the better case,"[42] for the Court should not "second-guess the jury or substitute its judgment for the jury's judgment if the jury's verdict is supported by sufficient evidence." Lipphardt v. Durango Stakehouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001). Indeed, the Court is not permitted to make credibility determinations or weigh the evidence when ruling on a JMOL.[43]

In a sex discrimination case supported by circumstantial evidence, the Court follows the three-pronged burden-shifting framework set forth in McDonnell-Douglas

---

[40] Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999); see also Webb-Edwards v. Orange Co. Sheriff's Office, 525 F.3d 1013, 1026 (11th Cir. 2008); Reeves, 530 U.S at 150; Tidwell v. Carter Products, 135 F.3d 1422, 1426 (11th Cir. 1998).

[41] Combs v. Plantation Patterns, Medowcraft, Inc., 106 F.3d 1519, 1526 (11th Cir. 1997) (citing Carter v. City of Miami, 870 F.3d 578, 581 (11th Cir. 1989)).

[42] Williams v. City of Valdosta, 689 F.2d 964, 970 (11th Cir. 1982) (quoting Boeing v. Shipman, 411 F.2d 365, 374-375 (5th Cir. 1969)).

[43] Reeves, 530 U.S. at 150 (citing Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-555 (1990); Anderson, 477 U.S. at 254; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962); Howell v. Compass Group, 448 Fed. Appx. 30, 34 (11th Cir. 2011); Combs, 106 F.3d at 1538.

Corp. v. Green, 411 U.S. 792 (1973).[44] First, a plaintiff must present evidence supporting her prima facie case of discrimination, the employer then bears the burden of production to present evidence of a legitimate, non-discriminatory reason for the adverse employment action. Id. at 237-238. Finally, if the employer makes such a showing, the plaintiff must present evidence that the proffered reason(s) is mere pretext for discrimination. Id.

Thus, to survive a defendant's motion for JMOL, the plaintiff need only present evidence supporting her prima facie case of discrimination "combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision." Reeves, 530 U.S. 153-154. Here, Travis has presented ample evidence to the jury that supported their reasonable determination that Travis was discriminated against on the basis of her gender.

### 1. *Travis Presented Sufficient Evidence to Support her Prima Facie Case of Discrimination.*

The prima facie case of sex discrimination under Title VII requires a plaintiff to show: (1) she was a member of a protected class; (2) she qualified and applied for the position; (3) she was rejected despite her qualifications; and (4) someone outside of the protected class was selected for the position. Howell, 448 Fed. Appx. at 33 (quoting

---

[44] Rainey v. Holder, 412 Fed. Appx. 235, 237 (11th Cir. 2011) (citing EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002)); see also Bogle v. Orange Co. Bd. of Comm'rs, 162 F.3d 653, 656 (11th Cir. 1998).

<u>Vessels v. Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763, 768 (11th Cir. 2005)). To withstand a directed verdict, there must be genuine disputes of material fact with respect to each of the elements of plaintiff's prima facie case. <u>Anderson</u>, 477 U.S. at 248-249. An issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather all that is required is that sufficient evidence supporting the claimed factual dispute be shown." <u>Id.</u> Travis has presented sufficient evidence to create a genuine dispute of material fact on each element of her claim such that a reasonable jury could – *and did* – find in her favor; therefore, a directed verdict is ***not*** appropriate.

### i. <u>Travis qualified for the 2008 Supervisor Position</u>

There is no dispute that Travis was a member of a protected class in that she is female. Additionally, the evidence shows that Travis qualified for the 2008 Supervisor position vacated by Teal.

Harris not only admitted that Travis was qualified for the position at issue, but also admitted that she was "a hundred percent" more qualified than Pooler and any other applicant. (DH 362:22-25, 372:15-17). Travis' immediate supervisors – Teal and Chambers – also testified that Travis was an exceptional employee who was qualified for a promotion to supervisor. (KT 211:12-15; TC 292:14-20). Additionally, Travis acted as a supervisor or manager on numerous occasions often *"performing better than the supervisors."* (TC 292:14-20).

23

Contrary to Defendant's assertions, Harris admitted that Travis' alleged attendance issues did not disqualify her from promotion. (DH 359:25-360:4). Moreover, Crankshaw was promoted from picker to Supervisor when he had similar attendance issues to Travis. (DC 263:19-264:7, PX 20). If these attendance issues did not preclude Crankshaw's promotion to Supervisor, clearly they could not have disqualified Travis from promotion. Thus, the jury had sufficient evidence to find that Travis qualified for the Supervisor position in June, 2008.

### ii.  Travis applied for the 2008 Supervisor Position

This Honorable Court should take judicial notice that Exel admitted to the jury that Travis applied for the position at issue. Indeed Exel's counsel told the jury,

> **"*Nobody is taking the position – you are not going to hear me – they like to set up straw arguments and knock them down. Nobody is saying, well, we're defending the case because she didn't apply. Nobody is saying that. I'm not saying that.*"**

(Tr. 599:11-15). The Court should take judicial notice that Travis applied not only because of the Company's admission, but also for purposes and fairness and equity. It would be wholly inequitable and illogical to allow Exel to make an admission to the jury of a material fact – that Travis applied for the Supervisor position – and then argue for a directed verdict on the basis that the jury had no reasonable foundation on which to believe the existence of that fact.

Moreover, regardless of Exel's admission, the evidence shows that Exel accepts both written ***and oral*** applications for promotions.[45] Specifically, Teal, Chambers, Pooler, Hudson, and Harris all testified that they were not required to – *and did not* – submit written applications when they were promoted within the Company. (Id.). Rather, they merely "*made it known*" to their supervisors and/or the hiring manager that they wanted to be considered for promotion and they were promoted as a result. Additionally, the <u>uncontested evidence</u> shows that **Pooler – *the individual selected to fill the 2008 supervisor position* – was not required to, *and did not*, submit a written application**. (MP 328:6-10; FH 407:1-8). Here, Travis applied for the 2008 Supervisor position when she met with Harris and asked to be considered for the position.[46] Accordingly, there is no dispute that Travis both qualified and applied for the 2008 Supervisor Position.

### iii.   <u>Harris Rejected Travis and Selected a Male (Pooler) Without Regard to Travis' qualifications</u>

There is no dispute that Travis was not selected for the Supervisor position at issue. Harris admitted he knew Travis wanted to be considered for the Supervisor position and the only supervisor position available was the position vacated by Teal.  (Id.). Harris also admitted that rejected Travis' application and did not consider Travis for the position at issue, despite the fact that she was ***"a hundred percent"*** more qualified than Pooler.[47]

---

[45] <u>See</u> DH 522:6-15; KT 207:20-208:10, 212, 222; MP 328:6-10; FH 399:14-18, 407:1-8
[46] CT 129:7-22, 137:19-138:14, 178:3-10; DH 347:14-18, 349:22-25, 526:1-6.
[47] DH 362:22025, 270:8-15, 372:15-17, 494:15-17.

The facts also unequivocally show that Pooler, a male, was selected to fill the Supervisor position vacated by Teal in or around June, 2008. (KT 212:24-213:6; MP 324:20-23). Specifically, Pooler held the ***Inventory Supervisor*** position at the PPG facility. (MP 325:5-326:23, PX 40). Teal was the Inventory Supervisor when he was promoted to OM in 2008. (CT 128:17-22, 196:9-16; KT 212:2-7). As Inventory Supervisor, Teal had one direct report – Inventory Lead, Travis – and was responsible for the inventory at the PPG facility. (CT 119:2-13; KT 210:2-211:8). Similarly, when Pooler was transferred and promoted to the Supervisor position at the PPG facility, Pooler also was in charge of inventory management and had only one direct report – Inventory Lead, Travis.[48] Indeed, Teal was explicitly told by Harris that he was the ***"Inventory Supervisor."*** (MP 325:5-326:23, 331:13-15, PX 40).

Accordingly, there is ample evidence from which a reasonable jury could have determined that Travis established each element of her prima facie case of discrimination.

> **2.**   <u>*Travis Presented substantial Evidence that Exel's Proffered Reasons for the Denial of Her Promotion were Mere Pretext.*</u>

### i.  *Harris' Comments are Direct Evidence of Pretext*

A comment is direct evidence of discrimination when it indicates that the employment decision at issue was motivated by gender.[49] To the extent Harris' comments

---

[48] MP 330:17-22, 332:4-6; KT 213:7-10; DC 266:18-21, 272:7-14).

[49] <u>See</u> <u>Floyd v. Federal Express Corp.</u>, 432 Fed. Appx. 924, 932 (11th Cir. 2011) (citing <u>Scott v. Suncoast Beverage Sales, Ltd.</u>, 295 F.3d 1223, 1227-1228 (11th Cir. 2002)).

to Teal act as direct evidence of pretext, the Court need not use the McDonnell-Douglas analysis, and must deny Defendant's JMOL.

Here, Teal testified, upon his promotion from Inventory Supervisor to OM, he recommended to Harris that Travis be promoted to the vacated Inventory Supervisor position. (KT 216:6-18, 236:9-17). In direct response to Teal's recommendation, Harris stated that "*he would not put a woman in a management position.*" (Id.; 216:25-217:5, 253:11-14). Harris' comment, when viewed in a light most favorable to Travis, clearly acts as direct evidence of discrimination as it related to the position and denied promotion at issue in this action and unequivocally showed that the basis for that decision was Travis' gender. Therefore, Defendants' Motions should be DENIED.

### ii.  *The Veracity of Exel's Proffered Reasons is in Genuine Dispute*

Travis presented substantial evidence at trial that Exel's proffered reasons for denying her the 2008 Supervisor position were false in that her attendance issues did not preclude her employment, nor was Pooler selected pursuant to the alleged PT Practice.

A Plaintiff survives JMOL "if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." Combs, 106 F.3d 1529 (11th Cir. 1997). Thus, "it is permissible for the trier of fact to *infer the ultimate fact of discrimination from the falsity of the employer's explanation*." Reeves, 530 U.S. at 147 (emphasis added). Indeed, once an employer's proffered reason is eliminated, "discrimination may well be the most likely

alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Id. (citing Furnaco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). As the 11th Circuit held in Bogle, "once a plaintiff has … put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its action, **that alone** is enough to preclude entry of judgment as a matter of law." 162 F.3d at 658 (emphasis added).

Here, as addressed in detail above,[50] a reasonable jury had ample evidence to determine that Travis' attendance issues were not a factor in Exel's refusal to promote Travis. Additionally, for the reasons expressed above, the PT Practice was not followed by Exel with respect to Pooler's promotion/transfer.[51] Pooler was asked to come in on a Saturday for a meeting with Blose and Hudson, and informed that he would be transferred/promoted to the Inventory Supervisor position at the PPG facility on the condition that he keep the promotion a secret.[52] With the consent of Director of Operations, Phillips, and HR Director Hudson, Harris selected Pooler for the Inventory Supervisor position vacated by Teal. As Hudson testified, it is contrary to the PT Practice

---

[50] Refer to Fact Section (H)(3) and Argument Section (I)(A)(i).

[51] Furthermore, as explained in detail above, the PT Practice is nothing more than a ruse to distract the fact-finder from Exel's nefarious actions as Harris was not aware of a PT Practice candidate until *after* Travis applied and Harris denied her the Inventory Supervisor position. (See CT 129:23-130:3, 138:12-20, 139:3-5; DH 347:14-18, 349:22-25, 350:1-4, 351:4-8, 354:17-20).

[52] MP: 324:35-325:12, 327:21-328:5, 329:14-19, 333:18-334:8; FH 403:18-22, 408:18-409:3).

for a transfer to be conditioned on the employee keeping the transfer secret. (FH 409:10-15; see also DC 278:22-25). Accordingly, sufficient evidence was presented to allow a reasonable jury to find that Exel did not follow the PT Practice with respect to Pooler's transfer/promotion. Thus, the Defendant's motion for JMOL must be DENIED.

### iii. *The Totality of the Circumstances shows that Exel's Proffered Reasons are Unworthy of Credence*

A plaintiff can "establish pretext indirectly by showing that the employer's proffered explanation is unworthy of credence."[53] To establish that the employer's proffer is unworthy of credence, the Court evaluates whether the plaintiff "has demonstrated such weaknesses, implausabilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." Ash v. Tyson Foods, Inc., 664 F.3d 883,892 (11th Cir. 2011) (citing Combs, 106 F.3d at 1532). A comment made by the decision maker evincing discriminatory animus can act as contributory evidence of pretext.[54] While Exel is correct that a comment unrelated to the employment decision issue at will not act as sufficient evidence of pretext *on its own*; such a comment can prove pretext when coupled with other evidence of discriminatory animus. Id.

---

[53] Bogle v. Orange Co. Bd. of Cmm'rs, 162 F.3d 653, 653 (11th Cir. 1998) (quoting Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).
[54] See Scott, 295 F.3d at 1229 (internal citations omitted) (citing Ross v. Rhodes Furniture, Inc., 146 F.3d 1286 (11th Cir. 1998); Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002)).

Here, there is not only evidence that Harris told Teal that "*he would not put a woman in a management position,*" but also there is substantial other evidence of Harris' discriminatory animus that is more than sufficient for a reasonable jury to find Exel's proffered reasons were mere pretext for discrimination.

Harris told Travis that he *"would not"* promote her when she applied to the position at issue. (CT 129:23-130:3, 138:12-20, 139:3-5). Additionally, Harris refused to promote Travis on at least three (3) other occasions in which he *lied* to Travis about the existence of the position and/or her eligibility for promotion. (See Fact Section (H)(4) & (6), above). Indeed, the evidence shows: (i) Harris refused to place a woman in any of the five (5) supervisor or manager positions he filled;[55] (ii) Harris was *"standoffish towards females;"*[56] (iii) Travis' supervisors, Chambers and Teal, felt that Harris refused to promote Travis because she was female;[57] (iv) Harris made various sexist comments toward Travis;[58] and (v) there were no females in any manager or supervisor positions at the PPG facility.[59]

Accordingly, there was substantial evidence on which a reasonable jury could find Harris' had a discriminatory animus; combined with evidence that shows the falsity of

---

[55] See Fact Section (H)(4), above.
[56] TC 295:14-19, 298:17-25.
[57] KT 218:5-16; TC 294:25-295:24.
[58] CT 181:11-18, 192:24-193:1.
[59] CT 196:21-23; LG 462:6-8; DC 273:13-274:3; KT 251:2-252:5; DH 345:10-17, 370:16-18.

Exel's proffered reasons, a reasonable fact-finder could find that Exel's proffer was unworthy of credence. Therefore, Exel's motion for JMOL should be DENIED.

### B.    Exel is Not Entitled to a New Trial

A motion for new trial may be granted *only if* the Court finds the verdict rendered by the jury was against the ***great weight of the evidence***.[60] When a trial deals with simple issues, the facts are in dispute, and there is an absence of pernicious occurrences, "trial courts should be considerably less inclined to disturb a jury verdict." Williams, 689 F.2d at 974. That is to say, when a defendant moves for a new trial on purely evidentiary grounds, the court should ***not*** grant a new trial "unless, at a minimum, the verdict is against the great – and not merely the greater – weight of the evidence." Lipphardt, 267 F.3d at 1186 (citing Hewitt v. B.G. Goodrich Co., 732 F.3d 1554, 1556 (11th Cir. 1984)).

While the Court may weigh the evidence when determining whether to grant a new trial, the Court "should not set the verdict aside as against the great weight of the evidence merely because, if he had acted as trier of fact, he would have reached a different result." Williams, 689 F.2d at 973 (citing J&H Auto Trim Co. v. Bellefonte Ins. Co., 677 F.2d 1365, 1373 (11th Cir. 1982)). As the Court explained in Williams, a "trial judge should not substitute his own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury." Id.

---

[60] Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1320 (11th Cir. 1999) (citing Rosenfeld v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1497-1498 (11th Cir. 1987)).

In <u>Williams</u>, the Eleventh Circuit reversed the District Court's grant of a JMOL/New Trial for abuse of discretion where it found that both parties had presented to the jury evidence, and reasonable inferences stemming therefrom, supporting their respective versions of the facts. 689 F.3d at 976. There, the Court held it was "left with the inescapable conclusion that there *is* no great weight of the evidence in any direction" and, thus, it was inappropriate to grant the defendant a new trial. <u>Id.</u>

Here, as in <u>Williams</u>, both parties presented evidence to the jury that could have led the jury to find for either party. Indeed, Travis elicited testimony from eleven (11) witnesses providing the evidence detailed above. The jury determined the credibility of each witness and weighed the evidence presented and reasonably returned a verdict for Travis. The simple fact is, the jury could have reasonably found for either party and, in such a circumstance, the Court should DENY Defendant's motion for new trial.

### C.   <u>Travis has Presented Sufficient Evidence for Compensatory Damages to be Awarded</u>

The appellate court is "particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so subjective and evaluating it depends considerably on the demeanor of the witness."[61] Contrary to the Defendant's assertions, general compensatory damages "need not be proven with a high degree of specificity… [but] 'may be inferred from the circumstances

---

[61] <u>Ash</u>, 664 F.3d at 899 (quoting <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1315 (11th Cir. 2001)).

32

as well as the testimony.'"[62] Indeed, the Court has held that "any evidentiary shortcomings 'go more to the amount, rather than the fact, of damage." Id. (quoting Marable v. Walker, 704 F.2d 1219, 1222 (11th Cir. 1983)). Additionally, the appellate court has held that even "humiliation and insult are recognized, recoverable harms." Id. (citing Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927 (5th Cir. 1996)).

In Ash the Court held that sufficient evidence of compensatory damages was present when the plaintiff showed the denial of his promotion caused him to lose sleep, lose weight, lose self-esteem, and that his attitude changed and he became a more emotional person. 664 F.3d at 899-900. Here, Travis presented evidence that she lost weight, could not sleep, withdrew from social interactions, and greatly suffered from a loss of confidence, embarrassment, humiliation, and frustration. (CT 127:25-128:8, 130:4-14, 134:1-23). As in Ash, such evidence is clearly sufficient to substantiate the jury's award of compensatory damages as the jury was in the best position to determine the credibility of Travis' testimony and the extent of the mental, emotional, and physical stress Travis suffered. Accordingly, the jury's award of compensatory damages should not be disturbed.

### D.   **Punitive Damages were Appropriately Awarded by the Jury**

#### *1.   Exel had Actual Notice of Harris' Discriminatory Actions*

---

[62] Ferrill v. The Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999) (citing Carey v. Piphus, 435 U.S. 247, 263-264 (1978); H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1088 (11th Cir. 1986)).

Notice to a designated person under an employer's anti-discrimination policy constitutes ***actual***, not merely constructive, notice to the employer. <u>Breda v. Wolf Camera & Video</u>, 222 F.3d 866, 899-890 (11th Cir. 2000). If a plaintiff presents evidence the employer had ***actual*** notice of discrimination, any evaluation of constructive notice to the employer is, obviously, not needed.

Here, Exel's alleged anti-discrimination policy states that an employee can complain about sexual discrimination to her supervisors or to human resources. (LG 303:4-305:3). Pursuant to Exel's policy, Travis complained to her supervisors – Teal and Chambers – as well as to Human Resources Manager Murphy and Human Resources Director Hudson. (CT 121:25-122:7; <u>see also</u> Fact Section (H)(4) & (7), above). Travis' latest complaint to Murphy occurred in **July, 2008**, immediately following the denied promotion at issue in this action. (CT 147:21-23, 150:11-13). Moreover, there is ample evidence that Travis' specifically complained of Harris' sexual discrimination throughout her tenure at Exel and that each and every time Travis complained the Company's response was the same – Exel did nothing other than inform her she should resign if she ever wanted an opportunity for promotion. (CT 125:5014, 127:4-20; TC 294:14-295:24). As Travis complained to multiple individuals identified by the Company's anti-discrimination policy (including the Company's HR Director, Hudson), Exel had ***actual notice*** of discrimination and allowed the discrimination to continue without pause or

investigation. Thus, punitive damages were properly assessed against the Company and should not be disturbed by the Court.

### 2.   *Exel had Constructive Notice of Harris' Discriminatory Actions*

#### i. **Travis Presented Substantial Evidence of Malice and/or Recklessness on the part of Exel**

There is no requirement that a plaintiff prove the employer's conduct was "egregious;" however, a plaintiff must present evidence that the employer acted with actual malice or reckless indifference to her federally protected rights. <u>Ash</u>, 664 F.3d at 900; <u>see also</u> <u>Howell</u>, 448 Fed. Appx. At 37; <u>Kolstad v. American Dental Ass'n</u>, 527 U.S. 526 (1999). The "malice" required is an "intent to harm," and the "recklessness" required is the "serious disregard of the consequences of one's actions." <u>Ash</u>, 664 F.3d at 900 (citing <u>W&O</u>, 213 F.3d at 611); <u>see also</u> <u>Kolstad</u>, 527 U.S. at 536. Thus, a plaintiff can show "malice" if there are intentional actions and evidence of a discriminatory animus on the part of the decision-maker. <u>Ferrill</u>, 213 F.3d at 611. Additionally, a plaintiff can show recklessness by demonstrating that the employer discriminated "in the face of a perceived risk that its actions will violate federal law." <u>Id.</u>

For those reasons set forth in great detail above, Travis presented ample evidence of Harris' discriminatory animus including, but not limited to: his statements to Travis and Teal; his general hostile attitude toward female employees; his refusal to select females to fill the numerous supervisor and manager positions that became available during his tenure; the complete lack of females in management; and his lies regarding

Travis' ineligibility for promotion based on her lack of a college degree. (See Fact Section (H)(4) & (6), and Argument Sec. (I)(b)(iii), above).

### ii. Harris, Hudson, and Phillips are Sufficiently high up the Corporate Hierarchy at Exel to Impute Liability to the Company

#### a. Exel waived its right to assert the decision makers were not sufficiently high up the corporate hierarchy.

As a threshold matter, Exel should be estopped from asserting punitive damages should not have been awarded on the premise that Harris was not high enough up the corporate hierarchy to impute liability to the Company as Exel failed to raise such an argument at the appropriate time. As the Eleventh Circuit explained in Webb-Edwards,

> a litigant who deems himself aggrieved by what he considers to be an improper occurrence in the course of trial or an erroneous ruling by the trial judge ordinarily must object **then and there**, or forfeit any right to complaint at a later time…the raise-or-waive rule … precludes a party from making a tactical decision to refrain from objecting, and subsequently, should the case turn sour, assigning error (**or, even worse, planting an error and nurturing the seed as insurance against an infelicitous result).**

525 F.3d at 1030 (citing United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995)).

Here, Exel did not raise this argument at the close of Plaintiff's case; indeed, Exel did not attempt to assert that Travis failed to present sufficient evidence of hierarchy until *after the close of evidence* at trial. Had Exel intended to argue insufficient evidence of hierarchy, it should have properly raised the argument at the close of Plaintiff's case. Exel's failure to do so not only arguably caused a waiver of this argument, but more importantly was a clear attempt to nurture a seed of error as insurance against the jury's

36

potential award of punitive damages in direct violation of the law. Accordingly, as a matter of equity, Exel should be estopped from asserting such an argument at this time.

### b. *Harris Discriminated against Travis with the Countenance and Approval of Hudson and Phillips*

Punitive damages can be awarded "if the discriminating employee was high up the corporate hierarchy ***or*** […] higher management countenanced or approved his behavior."[63] Not only did Harris admit he was a Network Manager, GM I, with authority over Exel facilities in Georgia, California, and Pennsylvania and that Harris reported directly to the Company's Director of Operations, but also Harris admitted that HR Director, Hudson, and Director of Operations, Phillips, countenanced and approved Harris' decision to deny Travis the Inventory Supervisor promotion.[64]

Harris admitted he reported to the Director of Operations. (DH 489:23-11, 523:1-8). Exel presented absolutely no testimony or other evidence in refute of this argument. Rather, the only evidence Exel presented to cloud the hierarchy of the Company is an assertion that there are more than 300 GMs employed by Exel. However, the Company presented no evidence as to how many of those GM's were ranked as "GM I" nor did Exel present any evidence as to how many – if any – of the other GMs were also Network Managers with responsibility for multiple facilities throughout the United States. Exel is

---

[63] Ash, 664 F.3d at 900-901 (quoting Miller v. Kenworth of Dothan, 277 F.3d 1269, 1280 (11th Cir. 2002)); see also Dudley, 166 F.3d at 1323 (citing Reynolds v. CSX Transp., Inc., 115 F.3d 860, 869 (11th Cir. 1997)).

[64] (DH 340:11-5, 366:11-14, 489:23-11, 514:16-515:17, 523:1-8).

in the best position to show the hierarchy of the Company, yet it failed to refute Travis' assertion that Harris is forth in command. It stands to reason that Exel's failure to assert any contrary hierarchical structure (other than general argument that there are 329 GMs) is insufficient to refute the evidence presented that **Harris in particular** *is* sufficiently high up the corporate ladder to impute liability to Exel.

Moreover, *Harris admits* both Hudson and Phillips discussed and approved of Harris' decision to deny Travis' promotion to Inventory Supervisor. (DH 489:23-11). Furthermore, Hudson was directly involved in the selection of Pooler over Travis for the position at issue in this action. (MP 324:25-325:12, 327:18-328:5; FH 403:18-22). Phillips and Hudson were sufficiently high up the corporate structure to impute liability to the Company. Thus, Exel undoubtedly had constructive notice of Harris' discriminatory actions sufficient to impute liability for purposes of punitive damages.

### 3. *The Kolstad Defense does not apply as Exel did Not Make a Good Faith Effort to Comport with the Law*

Under <u>Kolstad v. Am. Dental Ass'n</u>, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's *good-faith efforts* to comply with Title VII." 527 U.S. 526, 545-546 (1999) (emphasis added). Thus, to enjoy the protections of the <u>Kolstad</u> defense, the employer must present evidence of its good-faith efforts to comply with its written anti-discrimination policies, such as communication of the policy, ***training on the policy,***

***and enforcement of the policy.*** See <u>Ash</u>, 664 F.3d at 904. As the 10th Circuit held in

<u>Harsco Corp. v. Renner</u>, the <u>Kolstad</u> defense is available ***only*** when there is evidence of

the employer's good-faith efforts to comply with the law; however, "a plaintiff may still

recover punitive damages if she demonstrates the employer failed to adequately address

Title VII violations of which it was aware." 475 F.3d 1179, 1189 (10th Cir. 2007).

Here, current OM Crankshaw testified that he went **five (5) years** ***without any***

***training*** on the Company's alleged Title VII policies. (DC 264:21-265:2). Clearly, there

is sufficient evidence from which a reasonable jury could find that Exel failed to

adequately train its supervisors and managers on its alleged Title VII policies.

Furthermore, Travis presented substantial evidence that Exel did not enforce its written

anti-discrimination policies as Travis complained of Harris' discrimination to more than

four (4) officials under the guidelines of the policy and the Company took absolutely no

action in responding to her numerous and serious complaints. (<u>See</u> CT 121:25-122:7;

Fact Sec. (H)(4) and (7), above). A reasonable jury could easily have determined that

Exel took no effort to enforce its written Title VII policies. Accordingly, as Exel did not

make *good-faith* efforts to comply with Title VII, it is not entitled to the <u>Kolstad</u> defense,

and the jury's award of punitive damages should not be disturbed by this Court.

**E.**     **The Punitive Damage Award Should Stand as it is Not Excessive**[65]

The Court has no general authority to reduce the amount of a jury's verdict. Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1328 (11th Cir. 1999) (citing Kennon v. Gilmer, 131 U.S. 29 (1889)). Rather, "it is only appropriate for a judge to reduce a punitive damages award to below the maximum allowed under the §1981a statutory cap if the award is unreasonable or otherwise 'shocks the judicial conscience and constitutes a denial of justice.'"[66]

In determining whether an award is unconstitutionally excessive, the Court should turn to the three guideposts set forth in BMW of N. Amer., Inc. v. Gore:[67] (1) the degree of reprehensibility of the wrongdoing; (2) the disparity between the harm *or potential harm suffered* and the amount of the award; and (3) the difference between the punitive damages award and the available criminal and civil penalties. W&O, 213 F.3d at 614 (citing BMW 517 U.S. at 575).

---

[65] There is no merit to Exel's argument that it was not on proper notice that its actions could subject it to punitive damages up to the amount allowed under the statutory cap as *the very language of §1981a puts the employer on notice "that it could be liable for punitive damages up to the statutory cap."* W&O, 213 F.3d at 617 (emphasis added). Additionally, it defies logic to presume that Exel was not on notice that it could be liable for damages up to the limit of the statutory cap, but spent years and hundreds of thousands of dollars in attorneys' fees litigating a case with actual damages of less than $1,200.00.

[66] EEOC v. W&O, Inc., 213 F.3d 600, 617 (11th Cir. 2000) (citing Luciano v. Olsten Corp., 110 F.3d 210, 221 (2d Cir. 1997)).

[67] 517 U.S. 559 (1996).

### *1.   Exel's Actions Evince a High Degree of Reprehensibility*

The reprehensibility of defendant's actions is the "most important indicium of the reasonableness" of the punitive damage award. W&O, 213 F.3d at 614 (citing BMW, 517 U.S. at 575). The Eleventh Circuit has set forth several aggravating factors that illustrate reprehensibility including whether: (1) the harm was purely economic; (2) the defendant's conduct evinced indifference to or reckless disregard for the health and safety of others; (3) the injury was done intentionally through affirmative acts of misconduct or when the target was financially vulnerable; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit or mere accident." Id.; Myers v. Central Florida Investments, Inc., 592 F.3d 1201, 1219 (11th Cir. 2010) (citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)). In assessing these factors, the court "may consider material external to the charge in determining the reprehensibility of the charge itself."[68]

Here, based on the facts set forth in detail above, the factors weigh in favor of upholding the punitive damages award to Travis as: the violation of a Travis' civil rights was not purely economic;[69] the actions affected Travis' salary and financial status; Harris' discriminatory actions continued throughout Travis' tenure with Exel; and

---

[68] Myers, 592 F.3d at 1220 (citing Gore, 517 U.S. at 576-577 ("certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law.").

[69] See W&O, 213 F.3d at 614.

Pooler's promotion/transfer was steeped in trickery and deceit when he was ordered to keep the same secret.[70] Thus, there is sufficient evidence to establish the severely reprehensible nature of Exel's actions against Travis.

### 2. *The Ratio of Punitive to Other Damages is Reasonable Given the Award of Compensatory Damages and the Size of Exel*

The relevant ratio at issue is the ratio of punitive damages awarded to actual and compensatory damages, *including attorneys' fees and costs*. Action Marine, Inc. v. Continental Carbon, Inc., 481 F.3d 1302, 1321 (11th Cir. 2007) (finding that attorneys' fees and costs are properly included as they are compensatory in nature). Additionally, the Eleventh Circuit has consistently found that ***"low awards of compensatory damages may properly support a higher ratio than high compensatory awards."*** Id.; see also Walters v. City of Atlanta, 803 F.2d 1135, 1147 (11th Cir. 1986); Johansen, 170 F.3d at 1338 (emphasis added). Moreover, in cases "where injury is primarily personal, a greater ratio may be appropriate" to deter the defendant's reckless indifference of plaintiff's rights. Deters v. Equifax Credit Info. Servs., 202 F.3d 1262, 1273 (2000).

Here, Travis was awarded $500,000 in punitive damages which the Court properly remitted to $275,000. Travis' actual damages amount to approximately $191,198.73.[71]

---

[70] See Id. at 615 (citing Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 637-638 (7th Cir. 1996)); BMW, 517 U.S. at 576; Johansen, 170 F.3d at 1335.

[71] Travis was awarded actual damages of $1,184.37 in back pay and $293.33 in interest and compensatory damages of $25,000.00. Additionally, Travis incurred costs of $6,961.03 and attorneys' fees of no less than $157,760.00, not counting the cost of

Accordingly, Travis' punitive to other damages ratio is 1.44:1 ($275K: $191,198.73); a ratio well within reason given the facts and circumstances of Travis' claim.

Contrary to its assertions, the Eleventh Circuit has upheld numerous punitive damages awards that far exceed the ratio in this action.[72] In each such case, the Court affirmed the punitive damages award despite the high ratio, due in large part to the fact that the compensatory damage award was low in each case, evincing the need for a higher ratio to properly punish and deter the defendant from engaging in further unlawful acts.

In addition to looking at the ratio of actual to punitive damages, a Court is "empowered to consider the financial resources of the defendant when determining the constitutionality of an award."[73] Here, Exel's revenue is more than $4.8 Billion. (PX 2). Accordingly, the award of punitive damages in this action is less than 0.0001% of Exel's

---

defending against Defendant's motion for directed verdict and in the alternative requesting a new trial. Accordingly, Travis total damages – discounting punitive damages – amount to $191,198.73. (Dkt. Nos. 125-127).

[72] Myers, 592 F.3d at 1221 (upholding a ratio of **4.89:1**); Johansen, 170 F.3d at 1339 (upholding a ratio of **100:1**); Goldsmith, 513 F.3d at 1283, 1285 (upholding a ratio of **9.2:1**); W&O, 213 F.3d at 616-617 (upholding a ratio of **8.3:1**); Action Marine, 4881 F.3d at 1321, 1323 (upholding a ratio of 5.5:1); Bogle, 332 F.3d at 1362 (upholding a ratio of **3.8:1**); Deters, 202 F.3d at 1273 (upholding a ratio or **59:1**); Cooper v. Casey, 97 F.3d 914, 920 (11th Cir. 1996) (upholding a ratio of **12:1**); TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 459 (1993) (upholding a ratio of **526:1**).

[73] Myers, 592 F.3d at 1223 (citing Johansen, 170 F.3d at 1338); see also W&O, 213 F.3d at 616-617 (finding that a ratio may be permissibly high when the award is not disproportionate in comparison with the net worth of the company); Johansen, 170 F.3d at 1338 (finding that "a bigger award is needed to 'attract the attention' of a large corporation") (citing Continental Trent Resources v. OXY USA, Inc., 101 F.3d 634, 641 (10th Cir. 1996)).

revenue. Arguably, the punitive damage award is not sufficient to be of any deterring or punishing value as stands – certainly it would be wholly insufficient if further remitted by the Court.

Accordingly, as all of the factors set forth by the appellate courts illustrate that the award of punitive damages to Travis should be upheld, the Court should not further remit the jury's award of punitive damages and Exel's motion should be DENIED.

## IV. CONCLUSION

Thus, for the foregoing reasons, Exel's Motions for Judgment as a Matter of Law, and in the alternative, a New Trial should be **DENIED**.

Respectfully submitted this 9th day of August, 2011,

/s/ Rudjard M. Hayes
Rudjard M. Hayes
Georgia Bar No. 340329
SANCHEZ HAYES & ASSOCIATES, LLC
1015 Tyrone Road, Suite 620
Tyrone, Georgia 30290
*COUNSEL FOR PLAINTIFF-INTERVENOR*

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, counsel below certifies that this Response Brief was prepared using Times New Roman 14-point font.

Respectfully submitted this 9th day of December, 2011.

/s/ Rudjard M. Hayes
Rudjard M. Hayes
Georgia Bar No. 340329
rudjard@theconsensusgroup.com

SANCHEZ HAYES & ASSOCIATES, LLC
1015 Tyrone Road, Suite 620
Tyrone, Georgia 30290
(770) 692-5020 *telephone/*
(770) 692-5030 *facsimile*
*COUNSEL FOR PLAINTIFF-INTERVENOR*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have, this day, served a copy of the foregoing

**PLAINTIFF-INTERVENOR'S RESPONSE TO DEFENDANT'S MOTION**

**FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVLY, FOR A**

**NEW TRIAL**, by filing the same with the Clerk of Court using the CM/ECF

system, which will send notification of such filing to all counsel of record:

David R. Kresser, Esq.
Fisher & Phillips LLP
1075 Peachtree Street, NE
Suite 3500
Atlanta, GA 30309
***Counsel for Defendant***

Ottrell L. Ferrell
Robert K. Dawkins
Sairalina Montesino
Steven A. Wagner
Equal Employment Opportunity
Commission
Atlanta District Office – Legal Unit
100 Alabama Street, S.W.
4R30 Atlanta Federal Center
Atlanta, GA 30303-8704
***Counsel for Plaintiff***

Respectfully submitted, this 9th day of August, 2013.

/s/ Rudjard M. Hayes
RUDJARD M. HAYES
Georgia Bar No. 340329
***Attorneys for Plaintiff-Intervenor***

SANCHEZ HAYES & ASSOCIATES, LLC
1015 Tyrone Road, Suite 620
Tyrone, Georgia  30290
Telephone:  (770) 692-5023
Facsimile: (770) 692-5030
rudjard@theconsensusgroup.com