IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | |
|     Plaintiff, and | ) | |
| | ) | |
| CONTRICE TRAVIS, | ) | CIVIL ACTION |
| | ) | FILE NO.:  1:10-CV-03132-SCJ |
|     Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EXEL INC., | ) | |
| | ) | |
|     Defendant. | ) | |

**PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S RESPONSE IN OPPOSITION TO DEFENDANT EXEL INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

COMES NOW Plaintiff, the Equal Employment Opportunity Commission (the "EEOC"), and files this, its Response in Opposition to Defendant Exel Inc.'s ("Exel") Renewed Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial (the "Motion for JMOL"), and shows the Court as follows:

## I.    INTRODUCTION

At the close of a three-day jury trial during which all parties were heard fully, the jury returned a verdict in favor of the EEOC and Plaintiff-Intervenor

Contrice Travis ("Travis") and awarded them $25,000 in compensatory damages and $475,000 in punitive damages (which the Court properly reduced to $275,000). Exel seeks to upend that verdict and asks the Court to invade the province of the jury and enter judgment as a matter of law as to (1) liability and (2) punitive damages, or, in the alternative, grant it a new trial. The Court should deny the Motion for JMOL.

## II.   FACTUAL BACKGROUND

### A.   Harris Deceived Travis About the Existence of the Inventory Control Supervisor Position.

When Travis first became an Inventory Lead at the PPG facility, she did not have a supervisor. Tr. 114:5-8. In June 2007, Kenny Teal became her supervisor. Tr. 114:5-8. Travis learned that Teal would be her supervisor from Richard Crankshaw. Tr. 116:23-25. One night at work, Crankshaw told her that David Harris, the General Manager, was going to make Teal the Inventory Control Supervisor, which would make him Travis' boss. Tr. 117:1-7.

After learning this, Travis went to Harris and specifically asked him if there was a position called Inventory Control Supervisor, and Harris told her that the position did not exist. Tr. 117:8-11. Travis told Harris that if there was ever such a position, she was interested in it. Tr. 117:19-23. Harris again said the position did not exist and that he did not know what she was talking about. Tr. 117-24-118:1.

2

But within a week of that conversation, in June 2007, Harris announced Teal as the new Inventory Control Supervisor. Tr. 118:2-17.

Teal testified that he became Inventory Supervisor after Harris approached him and said they needed someone strong in inventory. Tr. 209:10-22.  Harris created the position of Inventory Control Supervisor and assigned Teal to that position. Tr. 209:10-22.  During this conversation, Harris told Teal that he would not put a woman in that position. Tr. 257:2-258:4.

Prior to becoming the Inventory Control Supervisor in June 2007, Teal was an Operations Supervisor managing employees in the operations of the facility. Tr. 118:24-119:7; 210:2-211:8.  After becoming the Inventory Control Supervisor, however, Teal was in control of inventory only and managed only one associate: Travis. Tr. 119:8-13; 210:2-211:8.  Teal testified that Operations Supervisor and Inventory Control Supervisor were two separate positions. Tr. 243:6-8.

**B.**   **Harris Told Travis That She was Not Qualified to be a Supervisor and Deceived Her About the Reasons.**

In addition to asking Harris about the Inventory Control Supervisor position in June 2007, Travis asked Harris about two Operations Supervisor positions that became open. Tr. 119:14-20.  When Travis asked Harris about these positions, he gave her a number of reasons why she was not qualified, including she did not have a college degree, she was not ready yet, and that she needed to focus on her

3

current responsibilities. Tr. 119:21-120:2.  Harris also told Travis that he wanted her to manage the ladies in the office. Tr. 161:3-8.  Importantly, Harris did not tell her that he had to fill the two Operations Supervisor Positions with other employees being laid off under Exel's purported priority transfer policy. Tr. 163:5-10.  Exel admitted in its Position Statement that Harris discussed these openings with Travis and her desire to be a supervisor, but Harris told her she needed to "focus on gaining knowledge and experience in her new role."  PX25, p. 2.

Although Harris told Travis she was not qualified for the open supervisor positions, she routinely filled in as a supervisor when they were out or on vacation and performed all of their management functions. Tr. 291:21-292:8.  In fact, Tommy Chambers, an Operations Manager, said that Travis sometimes performed better than the supervisors for whom she was filling in. Tr. 292:9-20.  Chambers was so impressed with Travis, that when the supervisor position filled by Calvin Sawyer was open, Chambers recommended Travis for that position. Tr. 292:21-293:13.  Harris, however, responded that Travis was not ready and needed more time. Tr. 293:17-20.  Chambers told Harris that he disagreed with this assessment, but Harris merely responded that the decision was his to make. Tr. 293:21-294:4.

Chambers suspected that the reason Harris would not promote Travis was because she was female. Tr. 295:11-20.  As a result, Chambers suggested to Travis

4

that she pursue employment opportunities elsewhere because he believed that Travis was not going to advance as long as Harris was the General Manager. Tr. 294:5-295:24.

## C.    **Travis Complained of Gender Discrimination.**

In early 2008, Travis complained to Marie Murphy, an Exel Human Resource Representative, that she did not think Harris was giving her the opportunity to be a supervisor because she is a woman. Tr. 123:18-22; 124:17-22; 127:1-9; 149:15-17.  Murphy responded that she understood how Travis felt because she also felt that she had experienced the same thing when she had been passed over for a promotion. Tr. 124:23-125:4.  Murphy also told Travis that Franklin Hudson was the HR representative over her facility now, so she should talk to him. Tr. 125:5-8.  Travis did not hear back from Murphy regarding her complaint, nor was she told that Murphy had started an investigation. Tr. 125:9-14.

Based on Murphy's advice, Travis also spoke with Hudson about her complaints in early 2008. Tr. 127:1-9; 149:15-17.  Travis went to Hudson within a couple of weeks of talking to Murphy and told him the exact same things she told Murphy: that Harris was not giving her the opportunity to be a supervisor because she is a woman. Tr. 127:1-9.  Rather than helping Travis or investigating her complaint, Hudson merely told her that she should look into transferring to another

work site. Tr. 127:15-24.  This advice from HR left Travis feeling frustrated and hopeless. Tr. 127:25-128:8.  Travis felt like she was being told to walk away from her job and the investment she had made at her facility. Tr. 127:25-128:8.

Exel claims that even if Travis complained, she did not complain about any promotions because the only thing she complained about was not getting the June 2007 Inventory Supervisor position, which it says was not an open position.  Exel misstates the evidence.  Sawyer was transferred into the PPG facility in February 2007. Tr. 478:12-19.  Teal was made Inventory Supervisor in June 2007. 119:2-17.  Travis says she complained about not getting promotions, plural, to Hudson in early 2008. Tr. 148:19-149:2; 149:22-150:2.

**D.**     **The Open Position.**

In May 2008, Harris promoted Teal to Operations Manager. Tr. 347:23-25.  Teal did not apply for this position; rather, he knew the position was opening and he went to Harris and inquired about it. Tr. 212:8-23.  Harris told him he thought he was a good candidate, so Harris and Gezo interviewed him and Harris then gave Teal the position of Operations Manager. Tr. 212:14-18.  Teal did not have to submit a formal application for this promotion. Tr. 212:19-20.

Teal believed that Travis was the best candidate for the Inventory Control Supervisor position after he was promoted to Operations Manager because she

knew the job as well as he did. Tr. 214:8-18.  In fact, Teal told Harris that she should get the job after he was promoted. Tr. 216:6-12.  But Harris told him she was not qualified and that he would not put a woman in a management position. Tr. 216:6-18.  This was one of several times that Harris had told Teal that he would not put a woman in a management position. Tr. 216:25-217:5.

When Travis learned that Teal would be promoted, she asked Harris about Teal's Inventory Control Supervisor position and told him she wanted that job. Tr. 129:7-22; 349:24-25.  Harris knew she was asking about Teal's job. Tr. 356:6-10. Harris told Travis that he was not going to hire an Inventory Control Supervisor; rather, he was going to be posting an Operations Supervisor position. Tr. 350:1-4. Harris did not encourage Travis to apply for that position. Tr. 351:4-8.  In fact, Harris told Travis, in no uncertain terms, that he was never going to make Travis a supervisor. Tr. 129:23-130:3.  Travis looked online to see if Teal's Inventory Control Supervisor position was posted, but did not see the opening. Tr. 130:15-21. If it had been posted, Travis would have applied for it. Tr. 130:22-24.

## E.    The Purported Priority Transfer Policy Was Used as a Subterfuge for Gender Discrimination.

Exel claims that its reason for transferring Pooler instead of promoting Travis was its purported priority transfer policy.  Even assuming the policy was legitimate, the evidence at trial demonstrated to the jury that the way in which it

7

was used in this case was a subterfuge for gender discrimination.

Harris discriminated against Travis when he told her that he was not going to fill the position of Inventory Supervisor and he was not going to make her a supervisor. Tr. 3501-4; 129:23-130:3. Those two facts kept her from applying. Tr. 129:7-16; 130:15-24; 179:3-10; 350:1-4. The jury could reasonably infer that Harris did this because he had told Teal he was never going to put a woman in that position. Tr. 216:6-18. Harris discriminated against Travis before he ever knew about Pooler being a transfer candidate. Harris did not testify that he told Travis that he had a transfer candidate that he had to consider first. Harris testified that he talked to Travis about the position and he told her that he *was going to post* an Operations Supervisor position. Tr. 350:1-4. If the purported priority transfer policy was the real reason, he would have told her that. But the evidence shows that Harris had not yet posted the position when he talked to Travis about the opening and, thus, did not know that Pooler would be a candidate.[1]

Even if the jury considered the purported priority transfer policy as a legitimate non-discriminatory reason, the evidence supports the jury's rejection of this reason. Prior to his transfer to the PPG facility, Pooler was a Quality

---

[1] This fact is further supported by Harris' statement during the fact-finding conference that he did not know about Pooler as a transfer candidate when he spoke to Travis about the open position. See Exhibit "M" to the EEOC's Response to the Motion for Summary Judgment, p. 9 of fact-finding notes.

Assurance Coordinator at Exel's Hawaiian Tropic facility. Tr. 324:12-13. A coordinator is not the same as a supervisor. Tr. 414:17-415:4.  Mike Blose was Pooler's General Manager at that facility. Tr. 324:14-16.  Pooler testified that he was called in on a Saturday to meet with Blose and Hudson. Tr. 324:20-325:12. Hudson does not recall the meeting or what he said, but he is sure he spoke with Pooler regarding his transfer. Tr. 408:18-409:5; 421:7-10.  Pooler's uncontroverted testimony is that he was told that his position at the Hawaiian Tropic facility was being eliminated, but there was an *Inventory Supervisor* position that was becoming available at the PPG facility. Tr. 324:20-325:12; 328:2-5; 329:14-19. Pooler was told, however, not to speak to anyone about it and threatened that if he did tell anyone, "it is out of the question, the position will not be available." Tr. 324:20-325:12; 334:4-8.  Pooler did not fill out an application or submit a résumé for the transfer to the PPG facility. Tr. 328:6-10.  Harris was given Pooler's name, and only his name, by Hudson for the open position. Tr. 361:4-6; 421:1-6.

Hudson admitted that conditioning a selection for a position by keeping it secret is not part of Exel's priority transfer practice and it would be highly unusual. Tr. 409:10-15.  This is because to do so would be showing favoritism to the person told to keep quiet about the open position, which would not be fair. Tr. 409:16-21.

After receiving Pooler's name from Hudson, Harris talked to Pooler's

General Manager, Blose, about Pooler before he hired him. Tr. 361:9-11.  Harris interviewed and then hired Pooler to fill the position of Inventory Control Supervisor that Teal vacated. Tr. 130:25-131:3; 212:24-213:4.  Harris made the final decision as to whether to hire Pooler, but he admits that he did not have to hire Pooler and that no one at Exel told him he had to hire Pooler. Tr. 361:12-362:1.  Harris also acknowledged that he could have promoted Travis to the open position and moved Pooler into Travis' old position. Tr. 362:2-3; 525:12-19.  But Harris never considered Travis for Teal's old job. Tr. 526:10-13.  Hudson also admitted, upon questioning by the Court, that if Travis had been promoted to the open position, that under the purported priority transfer policy, Pooler would have been considered for the now-open position of Inventory Lead. Tr. 427:4-15.

Although Pooler had been told the open position was for Inventory Supervisor, when he arrived at the PPG facility, he was made first shift supervisor. Tr. 325:4-16.  About four days later, Harris made Pooler the second shift supervisor. Tr. 325:17-20.  Shortly thereafter, Harris told Pooler to train with Travis in inventory and work with her "an abundance amount of time". Tr. 326:11-18; 327:9-12.  In fact, Pooler received all of his training from Travis. Tr. 331:7-12.

Immediately after Travis left Exel, Pooler was called into Harris' office and told that he is now the Inventory Supervisor. Tr. 326:19-23; 331:13-15.  At no time

10

while Pooler was a supervisor at the PPG facility, as first shift supervisor, second shift supervisor, or Inventory Supervisor, did Pooler manage even a single employee. Tr. 330:17-331:6; 332:4-6.  When Pooler was the Inventory Control Supervisor, he had the same duties that Teal had and, like Teal, did not manage a shift of associates. Tr. 213:7-16.  When Pooler was laid off in January 2009, Harris gave him a termination letter that identified his job title as "Exel/PPG Inventory Management Supervisor". PX 40; Tr. 357:8-13.

Travis was told that Pooler's title when he started at the PPG facility was Operations Supervisor. Tr. 131:6-7.  But Teal, the new Operations Manager, testified that Pooler replaced him as Inventory Supervisor. Tr. 213:5-6.  Prior to announcing that she was leaving Exel, Travis trained Pooler for at least two weeks in inventory. Tr. 131:8-12; 131:22-24.  The training in inventory that she provided to Pooler was much different than what she typically provided for new employees: it was much more intensive. Tr. 131:13-21; 180:8-25.  Travis realized that what she was really doing was training Pooler to do her job or Teal's job, but under the pretense that it was for him to be an Operations Supervisor. Tr. 132:10-19.

There was evidence of how the purported priority transfer policy was supposed to work when other employees were transferred.  In fact, when the PPG facility closed, Crankshaw testified that he was transferred under the priority

11

transfer policy. Tr. 278:14-25.  However, when Crankshaw was told about the new opening, no one told him to keep it quiet or he would not get it. Tr. 278:14-25. Also, when Jim Russell was transferred pursuant to the purported priority transfer policy, Russell signed and returned his offer letter to Exel, but there was no similar letter for Pooler when he was transferred to the PPG facility. Tr. 516:20-518:11; DX5; DX10.

**F.     Harris Was Employed in a "Managerial Capacity".**

Harris was not just the General Manager of the PPG facility, he was also the Network Manager for PPG and had responsibilities over Exel's California and Pennsylvania PPG facilities. Tr. 340:11-15; 514:16-515:7.  Guydon testified that Exel ranks its facilities with a tier structure based on head count, financial profitability, and the size of the site. Tr. 446:16-447:5.  She stated that the largest sites use the GM1 position, while the other sites have GM2s and GM3s. Tr. 446:16-447:5.  Harris was a GM1 level General Manager. Tr. 366:8-14.  Therefore, Harris was one of the top GMs for Exel.

As the General Manager at the PPG facility, Harris was the highest-ranking Exel employee at that site. Tr. 343:16-18.  He had complete responsibility for the functioning of the PPG facility. Tr. 343:19-24.  Harris was also the hiring manager in charge of hiring and promotions regarding supervisory and management

positions. Tr. 311:1-16.  He had complete authority with regard to hiring and promotions for Exel at the PPG facility. Tr. 344:9-16.

With respect to candidates presented to Harris for consideration under Exel's purported priority transfer policy, Harris made the final determination as to whether to hire that candidate. Tr. 312:24-313:2.  Hudson testified that the General Manager has the ultimate say as to whether to hire the transfer candidate. Tr. 417:4-11.  He also testified that a priority transfer candidate could be considered for "whatever position the General Manager at his site . . . feel[s] that they are qualified for." Tr. 426:19-24.

## G.   Exel's Anti-Discrimination Policy Was Not Effective.

Exel's anti-discrimination policy states, in relevant part: "Associates are expected to report violations of this policy as soon as possible to their supervisor, facility manager or the Human Resources representative . . . [and a]nyone receiving a complaint about discrimination shall, upon receipt, report it to a member of the Human Resources staff."  PX3, § 3.1.  Hudson, an HR Manager, and Guydon, an Area HR Manager, both testified that Travis could have made her complaint of gender discrimination to any human resources representative under this policy and that should have triggered an investigation. Tr 304:20-305:3; 412:9-13; 399:8-13; 444:4-7; 462:17-21.  Travis testified that she complained to both

13

Hudson and Murphy. Tr. 123:18-22; 124:17-22; 127:1-3; 149:15-17.   Once HR receives a complaint of discrimination, it is supposed to investigate it thoroughly. Tr. 304:17-25.   If HR receives a complaint of discrimination and does not investigate it, that is a violation of Exel's discrimination policy. Tr. 464:9-17. Neither Murphy nor Hudson investigated Travis' complaints; instead, they denied receiving any complaint of gender discrimination from her. Tr. 440:3-8; 422:3-8.

Exel claims it trains its staff on its anti-discrimination policy, but that is disputed by the evidence.   Guydon claims that Exel's discrimination policy is "reviewed annually at the site level" and that it is mandatory for members of the management team. Tr. 449:18-450:3.   But Crankshaw admitted that from the time he became an Operations Supervisor in October 2006, until at least his deposition in 2011, which was almost five years, he had *no training* on employment discrimination. Tr. 262:15-21; 264:21-265:2.   Despite the evidence that Exel did not properly train its management on discrimination, Harris admitted that he knows it is against the law to discriminate based on gender. Tr. 345:25-346:4.

**H.    Exel Did Not Object to the Court's Charge on Punitive Damages.**

Exel did not object to the Court's charge on punitive damages.  Tr. 568:25-569:3.  The Court's charge on punitive damages stated, in part:

> Specifically, Plaintiffs must show that an employee of Exel, acting in
> a managerial capacity, either acted with malice or with reckless

14

indifference to Contrice Travis's federally protected rights.

There is no bright-line rule about which employees act in a managerial capacity.  You must determine whether an employee acted in a "managerial capacity" based upon the type of authority Exel gave the employee and the amount of discretion that the employee has in what is done and how it is accomplished.

Tr. 621:10-623:8.  Nowhere in the charge given by the Court and approved by Exel is there a statement that the employee acting in a "managerial capacity" must be a "higher management official", or what that means, or that the employee's actions must have been approved of or countenanced by a "higher management official". Tr. 621:10-623:8.  Further, with regard to the verdict form, Exel stated in court that it could "live with" the two-part punitive damages verdict form that makes no reference to a "higher management official". Tr. 382:12-15.  The verdict form used by the Court also makes no reference to "higher management official".

I.   **Exel's False or Misleading Statements to the EEOC.**

Stacey Alvey is the Director for Employment Claims at Exel's corporate headquarters in Westerville, Ohio. Tr. 428:11-14.  In this position, Alvey manages all of the employment claims for Exel in the United States. Tr. 428:17-19.  She reports directly to Exel's Associate General Counsel. Tr. 428:22-23.  In 2009, Alvey's title was "Senior Legal Analyst", but her job was the same as it is now and she still reported directly to the Associate General Counsel. Tr. 430:15-21.

15

In 2009, Alvey drafted Exel's position statement in response to Travis' Charge of Discrimination (the "Position Statement"), which was sent to the EEOC. PX 25; Tr. 432:5-6.  The information in the Position Statement was based on her review of documents and on information provided to her by Guydon and Harris. Tr. 431:21-4.  In the Position Statement, Exel made at least five false or misleading statements to the EEOC:

(1)     That "[b]ecause Harris identified Travis as an employee with potential for growth he moved Travis in June 2006, to a group lead position where she was cross-trained in other areas, including inventory control."  PX 25.  Harris admits this is untrue. Tr. 352:24-353:7.

(2)     That "Harris specifically spoke to Travis to let her know that the position was open and encouraged Travis to apply." PX 25.  Harris eventually admitted that he did not encourage her to apply. Tr. 351:4-8.

(3)     That "[a]t that time Travis told Harris that she wasn't interested in taking a supervisor position at that facility because everyone knew her and she thought it would be difficult to transition from co-worker to supervisor." PX 25.   Harris admits this is untrue because Travis told him she wanted to be Inventory Supervisor. Tr. 353:20-354:11.

(4)     That Pooler's transfer was a lateral move because he "was already an

16

Operations Supervisor at a nearby Exel facility." PX 25.  Alvey now admits that Pooler was not an Operations Supervisor at the time. Tr. 43:4-15.

(5)     Pooler was "transferred to the supervisor position because he applied".  PX 25.  Pooler testified that he never applied for the transfer. Tr. 328:6-10.

Finally, while Alvey notes that Pooler's job site was being shutdown, nowhere in this letter is the purported priority transfer policy mentioned.  PX25.

### III.   ARGUMENT AND CITATION OF AUTHORITY

Exel moves for a Judgment as a Matter of Law pursuant to Rule 50(b), Federal Rules of Civil Procedure, or alternatively for a New Trial pursuant to Rule 59, Federal Rules of Civil Procedure.  There is more than sufficient evidence on both liability and punitive damages to support the jury's verdict, and the Court properly denied the initial motion for judgment as a matter of law made at trial.  In addition, there are no proper grounds upon which the Court can grant a new trial.  Therefore, both motions should be denied.

### A.   Exel's Rule 50(b) Motion Should be Denied.

A motion under Rule 50(b) requires the Court to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  "Credibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Id. at 255.  To do otherwise would invade the province of the jury.  Rather, the Court "consider[s] all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).  "[I]f there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then [the] motion [should] be denied and the case was properly submitted to the jury." Id.

    1.    <u>Whether Travis Applied or Whether Exel's Discriminatory Actions Kept Her from Applying is No Longer Relevant.</u>

Exel attempts to re-litigate the issue of whether the EEOC and Travis can establish a *prima facie* case of gender discrimination.[2]  Exel argues that Travis cannot establish that she applied for the position of Operations Supervisor.  It is well established, however, that "once a case is tried on the merits, the trial court is no longer concerned with whether the plaintiff made out a *prima facie* case, but, rather, the ultimate question may be addressed directly - whether the defendant

---

[2] It is questionable whether the *prima facie* case even matters. Teal's testimony that Harris said he was not going to put a woman in the position of Inventory Supervisor after Teal's promotion to Operations Manager in June 2008, is likely direct evidence of discrimination obviating the need for Plaintiffs to address the *prima facie* case. See Caban-Wheeler v. Elsea, 71 F.3d 837, 842-43 (11th Cir. 1996) (statement by decisionmaker that he wanted a black person to have a white employee's job was direct evidence of racially discriminatory termination).

intentionally discriminated against plaintiff." <u>Wall v. Trust Co. of Georgia</u>, 946 F.2d 805, 809-10 (11th Cir. 1991), <u>citing</u> <u>United States Postal Service Bd. of Governors v. Aikens</u>, 460 U.S. 711 (1983).   "[W]hen the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII." <u>Aikens</u>, 460 U.S. at 1482 (where motion for directed verdict denied, and defendant presented its own evidence of a legitimate non-discriminatory reason, *prima facie* case was no longer relevant).

At the JMOL stage, the question of whether the plaintiff made out a *prima facie* case is no longer relevant. <u>See</u> <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1539 n11. (11th Cir. 1997); <u>see</u> <u>also</u> <u>Callado v. United Parcel Serv., Co.</u>, 419 F.3d 1143, 1151 (11th Cir. 2005)("[B]ecause the district court had determined that [plaintiff] made out a *prima facie* case and had denied [defendant's] Rule 50(a) motion on that ground, the court should not have reconsidered whether a *prima facie* case existed at the Rule 50(b) stage.").   Rather, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." <u>Reeves v. Sanderson Plumbing Prods., Inc</u>*,* 530 U.S. 133, 153 (2000). Therefore, whether

19

Travis applied for a promotion, one element of the *prima facie* failure to promote case, is not relevant.

       2.     <u>Exel is Barred from Arguing that Travis Did Not Apply.</u>

Exel is either judicially estopped from arguing that Travis did not apply or it has admitted *in judicio* that she did.  The purpose of judicial estoppel is "to protect the integrity of the judicial process by prohibiting parties from changing positions according to the exigencies of the moment." <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001).  While the Eleventh Circuit typically requires that the inconsistent positions were made under oath and that such inconsistencies must be shown to have been calculated to make a mockery of the judicial system, it also recognizes that these factors are not exhaustive and that courts must always consider the specific circumstances of the case before it.  <u>See</u> <u>Burnes v. Pemco Aeroplex, Inc.</u>, 291 F.3d 1282, 1286 (11th Cir. 2002).

Plaintiffs presented exhaustive evidence at trial regarding Travis' verbal application for the Inventory Supervisor position and how Harris' deception (that he was not going to backfill Teal's position) is the reason Travis did not formally apply for the online posting.  Tr. 129-130:7-24.  Then, in its closing argument, Exel, through Mr. Kresser, stated, "Nobody is saying, well, we're defending the case because she didn't apply. Nobody is saying that. I'm not saying that." Tr.

599:13-15.  Therefore, Exel is judicially estopped from arguing that Travis did not apply for the open position.  To allow it to make that argument now, in the Motion for JMOL, would make a mockery of this Court.

At the very least, Exel's statement in its closing argument is an admission *in judicio* that Travis did apply for the open position or a waiver of that argument. This was not a concession made for the sake of argument, but an explicit admission that Exel does not contend that Travis did not apply for the open position. Therefore, it is an admission *in judicio* of a fact, that Travis applied for the open position, which binds Exel and prevents it from now arguing that Travis did not apply in the Motion for JMOL.[3]  See United States v. Bentson, 947 F.2d 1353, 1356 (9th Cir. 1991) (statement by counsel in closing argument was a judicial admission and a binding concession of a fact at issue in the case).

     3.      If Required, the Evidence was Sufficient for the Jury to Find that Travis Did Apply or was Kept from Applying.

Harris admits that Travis said she wanted Teal's job after he was promoted. Tr. 356:6-10.  Harris admits that Travis told him that she wanted to be Inventory Supervisor. Tr. 129:7-22; 349:24-25.  Harris admits he told Travis that he was not

---

[3] Abandoning the application argument at trial was undoubtedly a calculated decision based on the ample evidence that male managers, Harris, Teal, Crankshaw, Hudson and Pooler, were promoted or transferred without submitting an application.  Tr. 522:6-15; 212:19-23; 222:4-23; 261:7-10; 399:8-15; 328:6-10; 207:20-208:10.

going to fill that position, but, rather, he was going to post an Operations Supervisor position. Tr. 350:1-4.  In contrast, Pooler testified that he was told the opening was for Inventory Supervisor. Tr. 324:20-325:12; 328:2-5; 329:14-19. Then, immediately after Travis left Exel, Harris told Pooler that he is now the Inventory Supervisor, and that is also what he calls Pooler when he lays him off several months later. Tr. 326:19-23; 331:13-15.  This evidence of subterfuge and trickery shows that it was reasonable for Travis not to apply for the Operations Supervisor position.  "[F]ailure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor." Malarky v. Texaco, Inc., 983 F.2d 1204, 1213 (2nd Cir. 1993) citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 364-67 (1977).  "A relaxation of the application element of the *prima facie* case is especially appropriate when the hiring process itself, rather than just the decision-making behind the process, is implicated in the discrimination claim or is otherwise suspect." E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 349 (3rd Cir. 1990).

Further, an application was not a real requirement in this case.  Pooler did not submit a formal application.  When Crankshaw became an Operations Supervisor, he did not apply online either. Tr. 261:7-10.  When Teal became an Operations Supervisor, he did not apply or fill out an application. Tr. 222:4-9.

The purpose of the application requirement is to "eliminate [an] obvious nondiscriminatory reason: that the plaintiff was not offered the job because the company did not know [s]he was interested." Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984).  Even though Travis did not submit a formal application, it is undisputed that she told Harris she was interested in becoming Inventory Control Supervisor.  Travis applied in fact when she went to Harris and said I want my boss' job.  In the absence of sex discrimination, this informal process of expressing interest was effective – it is how Teal was promoted to Operations Supervisor and later to Operations Manager, and how Harris was promoted to General Manager. Tr. 223:4-23; 522:6-15.

In Rollins v. Alabama Comm. College System, 814 F. Supp. 2d 1250 (M.D. Ala. 2011), a female plaintiff was held to have satisfied the application requirement because the employer lied to her about the salary for an advertised position, which deterred her from applying.   The plaintiff, employed by a college, had asked the interim president on two different occasions what the advertised position would pay, and each time he stated it would pay no more than $55,000. Id. at 1270-1271.  Because the plaintiff did not want the position at that salary, which the interim president testified he knew, she did not apply, even though she had the opportunity to apply.  Id.  A male was ultimately hired for the position at a starting

salary of $70,000.  Id.  As a result, the Court held that there was a question of fact as to whether she was deterred from applying due to discrimination, which satisfied the application requirement of her *prima face* case. Id.

In denying Exel's Motion for Summary Judgment, this Court held: "In the event that it is determined that the vacancy at issue was for an inventory supervisor position (which was not posted); then, it could be found that Travis's general expression of interest would excuse the application requirement because the process would be considered informal and the employer would have had some reason to consider her for the vacancy."  E.E.O.C. v. Exel, 2102 WL 8304168, n.9 (N.D. Ga).  This is exactly what was shown through the evidence presented at trial. Therefore, the *prima facie* case, if still required to be met at this late date in the proceedings, was more than met.

> 4.    There is Sufficient Evidence from Which the Jury Could Find that Exel's Proffered Reason is a Pretext for Discrimination.

Exel alleges that the "routine application of the [priority transfer practice]" was its legitimate non-discriminatory reason for not promoting Travis.  See Motion for JMOL at 14.  Regarding pretext, a plaintiff may prevail by either persuading the jury that a discriminatory reason more likely motivated the employer or by showing that the employer's proffered explanation is unworthy of credence. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

24

Harris did not even know that Pooler was a transfer candidate at the time he spoke to Travis about the open position.  If he had, he would have told her that he had to consider Pooler before he considered her.  But that is not what he told Travis.  Harris testified that he told her he "was going to post an Operations Supervisor position", not an Inventory Supervisor position. Tr. 350:1-4. Travis testified that Harris told her, not that he had to consider Pooler, but that he was never going to make her a supervisor. Tr. 129:23-130:3.  This evidence was sufficient for the jury to reasonably conclude that Harris discriminated against Travis during this conversation when he had the opportunity to promote her, like the males, after her expression of interest.  The fact that Harris had not yet posted the position means that when he rejected Travis he did not know that Pooler or any other transfer candidate was a possibility, and that the transfer policy is an after-the-fact excuse and pretext for discrimination.

The jury had sufficient evidence to reject the so-called priority transfer policy as a legitimate non-discriminatory reason because Exel violated its own process in purporting to transfer Pooler under the policy.  First, Pooler did not fill out an internal application for the transfer. Tr. 328:6-8. While Hudson attempted to change his testimony about whether an application was required, he was impeached as to that issue and the jury could have reasonably concluded that he

was not being truthful at trial. Tr. 404:7-16; 406:19-23. Second, there was evidence for the jury to conclude that Exel threatened Pooler that if he told anyone about the job opening he would not get it. Tr. 334:4-8. Hudson admitted that secrecy was <u>not</u> part of the purported priority transfer policy because it would not be fair. Tr. 409:10-12. Third, Hudson's admission is exacerbated by the fact that he participated in the meeting where Pooler was told to keep quiet. Fourth, the jury heard evidence that Pooler was told that the open position was for Inventory Supervisor even though the posting was for Operations Supervisor. Tr. 324:20-325:12; 328:2-5; 329:14-19. Fifth, Exel presented evidence of a signed offer letter from Jim Russell when he was transferred in April 2008, but there is no evidence of a signed offer letter from Pooler. Tr. 516:23-518:9.

As much as Exel trumpets this policy, and even if it is used to save jobs, in this instance, in this case, with Travis and Pooler, Exel drastically deviated from its policy and did things secretly, informally and, admittedly, unfairly. Tr. 409:16-21. The jury could, and apparently did, conclude that this surreptitious deviation from Exel's alleged standard practice showed evidence of pretext. <u>See</u> <u>Bass v. Bd. of County Comm'rs, Orange County, Fla.</u>, 256 F.3d 1095, 1108 (11th Cir. 2001) (overruled in part on other grounds) ("An employer's violation of its own normal hiring procedure may be evidence of pretext.").

Finally, because Harris had the unfettered discretion to promote Travis at the time she expressed interest, and then backfill her Inventory Lead position, the jury had sufficient evidence to conclude that the purported priority transfer policy was a post-hoc irrelevant excuse.  Hudson admitted, upon questioning by the Court, that if Travis had been promoted to the open position, that under the purported priority transfer policy, Pooler could have been considered for the now-open position of Inventory Lead. Tr. 427:4-15.   Harris admits he had the power to do this. Tr. 362:2-3; 525:12-19.   Finally, Harris' statement to Teal that he was not going to follow his recommendation to put Travis in Teal's old position after he was promoted because he did not want to put a woman in that position is sufficient evidence for the jury to outright reject the purported policy as the true reason for Travis' non-selection.

5.     The Jury's Finding that Exel's Decision to Not Promote Travis
        Was Based on her Gender is Supported by the Evidence.

Title VII prohibits an employer from discriminating against an employee on the basis of sex, which is established when the employee demonstrates that sex was a "motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  Exel claims that there is no record evidence that the failure to promote Travis was based on her gender.  It attempts to argue that Teal testified that Harris only said that he would not put a

27

woman in the position of Inventory Supervisor one time, in June 2007, and that he was not making the discriminatory statement to or about Travis, therefore, it is a stale and unrelated statement. See Motion for JMOL pp. 18-19.  This is wrong both factually and legally.  Factually, it is a complete and utter distortion of the record. Teal testified unequivocally that Harris made this statement "a couple of times". Tr. 216:25-217:3. Teal also testified repeatedly, even when Exel attempted to get him to change his testimony, that Harris's statement that he would not put a woman in the position of Inventory Supervisor when Teal recommend to Harris that Travis replace him in that position occurred when he was promoted to Operations Manager. Tr. 236:25-239:11.

Legally, the statement is not stale and irrelevant.  Even if it is not considered direct evidence of discrimination, it is still part of the circumstantial case presented to the jury for its consideration. See Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002) (comment about a woman other than plaintiff not deserving her job could prove a circumstantial case for pretext); see also Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1323 n. 4 (11th Cir. 1998)(Language not amounting to direct evidence, but showing animus, may be significant evidence of pretext). Teal testified Harris said he would not put a woman in the Inventory Supervisor position "a couple of times", including in discussing the open position

28

at issue at trial.  Harris' statement in response to Teal's recommendation of Travis for the open position is even more damning when considered with Travis' testimony that Harris told her he would *never* make her a supervisor when she told him she wanted the open position.

Harris admits he had total authority as to whom to put in the Inventory Supervisor position. Tr. 312:24-313:2; 344:9-16.  Hudson agreed that Harris could have promoted Travis and put Pooler in the vacated lead position. Tr. 427:4-15. However, despite Teal's recommendation, Harris said he would not put a woman in the position. Tr. 214:8-18; 216:6-18.  This is sufficient evidence to demonstrate that Travis' gender was a motivating factor, and a violation of Title VII.

**B.    The Punitive Damages Award Is Supported by the Evidence.**

   (1)    The Evidence at Trial Satisfies Kolstad.

To imput liability for punitive damages to an employer, a plaintiff must show that: (1) The discriminating employee or employees acted with "malice" or "reckless indifference"; and (2) a basis for holding the employer liable for the acts of the employee or employees. See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 539-43 (1999).  If these two things are shown, the employer is liable unless the employee or employees' discriminatory conduct occurred despite the employer's good-faith efforts to comply with Title VII. Id. at 544.

(a)     **Exel's Employees Acted with "Malice" and "Reckless Indifference".**

An employee may recover punitive damages where the employer intentionally "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. 1981a(b)(1).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law.. . ."  Kolstad, 527 U.S. at 535.  That is, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Id. at 536.

Harris admitted that he knew it was against the law in 2008 to discriminate against an employee based on their gender. Tr. 345:25-346:4.   Despite his knowledge of the law, based on Teal's and Travis' testimony, the jury had sufficient evidence to conclude that Harris disregarded the law and intentionally blocked Travis from promotional opportunities based solely on the fact that she was a female.   Tr. 216:6-16; 216:25-217:3; 129:21-130:3.   That is, Harris' statements that he would never promote a woman into the Inventory Supervisor position, and then acting on those statements by not promoting Travis, while knowing it was illegal, is sufficient to support a finding of "malice" or "reckless indifference".  Bogle v. McClure, 332 F.2d 1347 (11th Cir. 2003)(knowledge of

30

illegality sufficient to show "malice" or "reckless indifference).

"A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." Bruso v. United Airlines, Inc., 239 F.3d 848, 858 (7th Cir. 2001); see also Bivins v. Wrap it Up, Inc., 2007 WL 3047122, *8 (S.D. Fla). There is substantial evidence that Alvey, Guydon, and Harris were untruthful in drafting and/or providing the false information in the Position Statement.  The jury could also have reasonably believed that these three witnesses, as well as Hudson and Murphy, were being untruthful at trial (e.g., Harris testifying that many points in the Position Statement are not true) to cover up their wrongdoing.  Exel's employees have continually attempted to deceive Travis, the EEOC, and the jury. That deception is sufficient to demonstrate reckless indifference. See id.

### (b)     There is a Basis for Imputing Punitive Damages to Exel.

The Supreme Court looked to agency principles, and in particular to the Restatement (Second) of Agency, to determine whether the discriminatory conduct of an employee can be imputed to the employer.  Kolstad, 527 U.S. at 542-43.  It identified four circumstances under which punitive damages can be awarded against a master based on an act of an agent.  Id.  The two that are relevant here

31

are: (1) "the agent was employed in a managerial capacity and was acting in the scope of employment" and (2) "the principal or a managerial agent of the principal ratified or approved the act".  Id.

Whether an employee serves in a "managerial capacity" is determined by "the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." Kolstad, 527 U.S. at 543 (quotation omitted).  The "employee must be important," but "*need not be the employer's 'top management, officers, or directors*,'" to be acting in a managerial capacity. Id., (emphasis supplied).  No one disputes that Harris was the highest-ranking Exel employee at the PPG facility, that he was a GM1, the highest-level GM at Exel, that he had absolute final authority over hiring and promotions, that he had total discretion over whether to accept a priority transfer candidate, or that he had total responsibility for the PPG facility and its operations.  Based on the instructions from the Court, to which Exel did not object, the jury found properly that Harris was acting in a "managerial capacity" when he refused to promote Travis and, instead, transferred Pooler into the open position. Such a finding is fully supported by the evidence admitted at trial.

The Eleventh Circuit appears to require an additional showing beyond what is required by Kolstad, that is, that a "higher management official" did the bad act

or knew about it and countenance or ratified it.  The jury, however, was not asked to make this determination.  Instead, the Court used the Eleventh Circuit's new Pattern Jury Instruction for punitive damages in a Title VII case and Exel did not object to its use. Tr. 621:10-623:8.  The Eleventh Circuit's charge strictly follows Kolstad and does not mention the "higher management official".  By seeking a JMOL based on an argument that there is insufficient evidence that Harris was a "higher management official" or that one knew about and approved his conduct, makes no practical sense.  That is, Exel is asking the Court to find that there was not enough evidence for the jury to decide an issue that, pursuant to the Eleventh Circuit's Pattern Jury Instruction, it was not asked to decide.

As an initial matter, the heightened standard is in direct conflict with the standard set forth by the Supreme Court in Kolstad.  Nowhere in Kolstad does the Supreme Court hold that the person acting in a "managerial capacity" has to be a "higher management official".  See Kolstad, 527 U.S. at 542-43.  The Supreme Court merely held that there has to be a basis for imputing punitive damages to the employer based on agency principles and then approved several different ways in which plaintiffs could do that, with no mention that there had to be a "higher management official" (in effect, a principal) involved.  Id.  Therefore, the Eleventh Circuit's "higher management capacity" standard is invalid under Kolstad.

33

Nevertheless, even if the Court applies the Eleventh Circuit's heightened "higher management official" standard, there is more than sufficient evidence to support an award of punitive damages against Exel.

The "higher management official" requires the plaintiff to prove that "the employer itself knew about or ratified the discriminatory acts, or the decision maker who discriminated was far enough up in the corporate hierarchy that his discriminatory acts should be imputed to the corporate employer." Ash v. Tyson Foods, Inc., 664 F.3d 883, 901-02 (11th Cir. 2011).[4]   This standard appears to reflect the other independent basis under the Restatement (Second) of Agency for holding the employer liable, that the principal or a managerial agent of the principal ratified or approved the act. See Koldstad, 527 U.S. at 542-43.

Even under this standard, there is sufficient evidence for the jury to reasonably conclude that Harris was a "higher management official".  He had a GM1 designation with ultimate authority over the entire PPG facility.  He also had a "Network Manager" designation which gave him multi-state managerial authority over two additional PPG facilities in Fontana, California and Harrisburg, Pennsylvania. Tr. 340:11-15. Tr. 514-515:16-7.  This authority included the power

---

[4]  The authorization, approval or ratification of the wrongful act are methods of imputing respondeat superior liability, *but so is acting in a managerial capacity* within the scope of one's employment.  See Kolstad, 527 U.S. at 542-43.

to assign Travis to an Operations Supervisor detail in Fontana. Tr. 116:8-14. Within the local PPG facility, Harris was the top manager with authority over two tiers of management – the Operations and Inventory Supervisors and the Operations Manager. Tr. 343:22-344:5. Thus, Harris was sufficiently high in the organization to impute punitive damages liability to Exel.

Further, liability for punitive damages is imputed to Exel because it *knew about* or ratified the acts of Harris through its officials designated to receive and investigate complaints of discrimination – Hudson (HR Manager) and Murphy (HR Representative). Tr. 399:8-12; 439:7-10. They were the two Human Resources officials that Exel told its employees could receive complaints of discrimination on behalf of the company.  See Pla. Ex. 3, § 3.1.  Because Travis complained directly to both Murphy and Hudson under Exel's anti-discrimination policy, Exel was put on actual notice that Travis was alleging gender discrimination by Harris.  See Breda v. Wolf Camera & Video, 222 F.3d 886, 889-90 (11th Cir. 2000)(notice to designated person under discrimination policy was actual, not constructive, notice to employer).  This is entirely consistent with the holding in Kolstad, which is based on agency principles, because Exel made Hudson and Murphy its agents by designating them as persons to whom Travis was supposed to complain.  Thus, Harris' discriminatory conduct is imputed to Exel

35

because it actually had notice of his conduct when Travis complained of sex discrimination directly to the agents appointed to investigate such complaints.

In this case, however, not only did Hudson not investigate Travis' complaint, he shrugged it off and told her to just transfer to another site. Tr. 127:1-24.  To compound matters, after Travis' complaint to Hudson about Harris' refusal to promote her based on sex, Hudson participated in the meeting wherein Pooler was secretly notified that he would receive the "Inventory Supervisor" position that Travis coveted. Tr. 324-325:25-8; 333:18-24.  This evidence is sufficient for a jury to find that Exel was on actual notice of prior sex discrimination, failed to act on it, and then actively participated in subsequent discriminatory conduct during Pooler's selection. In other words, through the HR function, the evidence was more than sufficient for the jury to impute punitive damages to Exel. See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262 (10th Cir. 2000)(Complaint to human resource officer for branch at which plaintiff was employed was sufficient to impute actual knowledge to defendant). This is true even though Exel argues that Hudson was a low-level employee. See Swinton v. Potomac Corp., 270 F.3d 794, 810-11 (9th Cir. 2001)(complaint to so-called low level employee was sufficient because defendant designated that person in its employee manual as the proper recipient of discrimination complaints).

36

Exel's liability, based on actual notice of the discrimination through Hudson, its designated agent for receipt of discrimination complaints, is not inconsistent with any of the post-Kolstad punitive damages cases decided by the Eleventh Circuit.  None of the cases cited by Exel or discussed by the Court and the parties during trial involved facts similar to this case.  Cases in which the Eleventh Circuit found no "higher management official" were cases in which the employer had only constructive, not actual, knowledge of the discriminatory conduct.  See Miller, 277 F.3d 1269.   Exel cites Wilbur v. Correctional Servs., Corp., as purported authority that even a complaint to human resources is not enough, but there are at least three problems with Exel's argument: (1) the first complaint to HR in Wilbur did not reference discrimination and the second complaint to HR occurred well after the plaintiff's employment was terminated; (2) there was no factual discussion in the opinion regarding whether the company's complaint procedure designated the person plaintiff complained to as the person to receive complaints; and (3) the punitive damages discussion was *dicta* because the issue was rendered moot by the Court's finding that the employer was entitled to judgment as to liability.  393 F.3d 1192 (11th Cir. 2004).

> **(c)** **The Jury Reasonably Concluded that Exel Did Not Make Good Faith Efforts to Comply with Title VII.**

The Supreme Court recognized that simply making an employer liable under

agency principles was inconsistent with the remedial nature of Title VII, so it added the "good faith efforts" defense.  Kolstad 527 U.S. at 544.  That is, if there is a basis for holding the employer liable for punitive damages, the employer can escape liability if it shows it made good faith efforts to comply with Title VII.[5]  Id. The evidence at trial demonstrates that there is a basis for holding Exel liable for punitive damages, and that Exel did not satisfy its good faith efforts defense.

Exel claims it made good faith efforts to comply with Title VII because it has an anti-discrimination policy and trains it staff on it.  Simply having a policy is not enough; rather, that policy must be shown to be effective.  See Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1281-82 (11th Cir. 2008)(Simply having a policy is not sufficient to show "good faith efforts" to comply with Title VII; it must also be effective).   While Exel claims it trains its employees on its anti-discrimination policy, that contention is not supported by the trial evidence. Guydon claims that Exel's discrimination policy is "reviewed annually at the site level" and that it is mandatory for members of the management team. Tr. 449:18-450:3.  But Crankshaw admitted that from the time he became an Operations Supervisor in October 2006, until at least his deposition in 2011, which was almost

---

[5] The sole purpose of Kolstad's good faith defense is to protect employers from the unauthorized conduct of *non-principals acting within the scope of their employment*.  Thus, if Harris is not sufficiently high in the corporate ladder to be considered a principal, the good faith defense applies to protect the employer from the conduct of its managerial agent.

five years, he had no training at all on employment discrimination. Tr. 262:15-21; 264:21-265:2.  Even though there is evidence that Exel did not properly train its management on discrimination, Harris admitted that he knows it is against the law to discriminate against an employee based on her gender. Tr. 345:25-346:4.

In addition to not actually training its managers on its anti-discrimination policy, the evidence demonstrates that the policy was in no way effective.  Travis complained of gender discrimination to Murphy and Hudson, both in HR, but neither of them investigated her complaints.  In fact, Hudson told her that she should just transfer. Tr. 127:1-20.  Not only did Hudson fail to enforce the policy, he was complicit in the actual discrimination because he was at the meeting with Pooler and Blose when Pooler was threatened that he would not get the job if he told anyone about it.  Hudson testified he knew that was not the policy, but Pooler testified that is what occurred.  The inaction of Hudson and Murphy, and the complicity of Hudson, both of whom were persons to whom Travis was supposed to complain under Exel's anti-discrimination policy, demonstrate that the policy was totally ineffective.  See Goldsmith, 513 F.3d at 1282 (Motion for JMOL denied where jury found anti-discrimination policy was not effective after plaintiff reported discrimination and nothing was done); Herzberg v. Sram Corp., 262 F.3d 651, 663-64 (7th Cir. 2001) (Lack of good faith shown where plaintiff's

complaints were shrugged off by managers ineffective at stopping discrimination); Deffenbaugh–Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 286 (5th Cir. 1999) (Managers' failure to respond effectively to complaints evidenced of lack of good faith); Swinton v. Potomac Corp., 270 F.3d 794, 810-811 (9th Cir. 2001) (Mere existence of policy insufficient to establish good faith).  The ineffectiveness of the policy and alleged training is also demonstrated in Teal's failure to notify anyone of Harris' discriminatory comments. Tr. 216:25-217:3; 217:22-218:4.   In sum, there is no basis to overturn the jury's finding that Exel did not establish its "good faith efforts" defense.

      (2)     The Amount of Punitive Damages is Not Excessive.

Punitive damage awards are to be reviewed based on three guideposts: (1) The reprehensibility of defendant's conduct; (2) the ratio of the punitive damages awarded to the actual harm (compensatory damages) inflicted on the plaintiff; and (3) a comparison of the punitive damages awarded with the civil penalties that could be imposed. See BMW of North America v. Gore, 517 U.S. 559, 575 (1996). Importantly, "in analyzing a punitive damages award for excessiveness, we must consider the goal of deterrence . . . [in which the] size and wealth of the defendant are relevant factors in this regard." Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1272 (10th Cir. 2000); see also E.E.O.C. v. W&O, Inc., 213 F.3d 600,

616–17 (11th Cir. 2000) (noting that "wealth and size of the defendant" could be considered in determining whether the punitive damages award was reasonable).

The Supreme Court has "instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003). Travis suffered emotional harm, her harm was intentional, and it involved trickery and deceit. Based on at least these two factors, Exel's conduct was reprehensible.

Reprehensibility can also be demonstrated where a case involves harm that was not purely economic, such as in a case involving a person's civil rights. See Goldsmith, 513 F.3d at 1283. Travis testified that she suffered a loss of confidence, worry, and similar type of emotional harm. The economic loss in this case, about $1,100, was almost not the point. This case was about sex discrimination against Travis and what that did to her, not the income she lost by not being promoted. Therefore, the effect on Travis' mental state and the denial of her civil rights made Exel's conduct reprehensible.

41

The ratio of punitive damages to compensatory damages is reasonable under the evidence.  The ratio is 19 to 1 based on $25,000 in compensatory damages and $475,000 in punitive damages awarded by the jury. After the Court properly reduced the punitive award to $275,000 based on the caps, the ratio is now 11 to 1. Even though both ratios exceed double digits, punitive damages greater than single-digit multipliers are upheld where the compensatory damages are relatively small, but there is a great need for deterrence.  See Goldsmith, 513 F.3d at 1284 (citing cases in which 2,173 to 1, 100 to1, and 26 to 1 ratios upheld because of need for deterrence).  Otherwise, if faced with only small penalties for violating civil rights, the Court is in effect telling companies that they can adopt a "discriminate and pay" policy, which is contrary to the spirit of Title VII. See Johansen v. Combustion Eng'g., Inc., 170 F.3d 1320, 1339 (11th Cir. 1999)(100 to 1 ratio approved to deter companies from adopting "pollute and pay" environmental policy).

With regard to the amount of punitive damages compared to the civil penalties that could have been imposed, the damages cap for Exel is $300,000. 42 U.S.C. § 1981a(3)(D).  As a practical matter, the $475,000 award was reduced below the cap.  Exel was on notice pursuant to Section 1981a that the cap is $300,000 for a company of its size, and the ultimate award of $275,000 in punitive

damages was less than the cap.  Therefore, the award was not excessive.

Last, Exel is a very large company that had revenue of $4.8 billion in 2008, the year Travis was subjected to discrimination. PX2. The punitive award of $475,000 was less than .0001 percent of Exel's 2008 revenue.  This is hardly an excessive award for a company with these kinds of revenues.  For the award to be any deterrent at all for a company the size of Exel, the punitive award has to be large.  In this case, the award was comparatively small.  It is in no way excessive either under the law or as a practical matter.

## III.   Rule 59 Motion for New Trial Should be Denied.

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."   Fed. R. Civ. P. 59 (a)(1).   Typically, the Eleventh Circuit approves the grant of new trials only where the jury verdict is against the great weight of the evidence or the damages award is excessive.  See Simon v. Shearson Lehman Bros., Inc., 895 F.2d 1304 (11th Cir. 1990).   As discussed, there is more than sufficient evidence to establish Plaintiffs' claim of gender discrimination and to support an award of punitive damages.  Therefore, the Court should not grant a new trial in this case.

While the Court has discretion to grant a new trial, that discretion should be

used carefully and judiciously to avoid denying the parties the right to a jury trial.

See Redd v. City of Phenix City, 934 F.2d 1211, 1215 (11th Cir. 1991) (if "a district court grants a new trial because the verdict is against the weight of the evidence, th[e] [Eleventh Circuit]'s review will be *extremely stringent* to protect a party's right to a jury trial.").  Exel essentially asks the Court to substitute itself for the jury in examining the evidence.  But "the district judge should not substitute his own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury." Rosenfield v. Wellington Leisure Products, Inc., 827 F.2d 1493, 1498 (11th Cir. 1987).  Therefore, the Court should deny the Motion for New Trial.

   Respectfully submitted, this 9th day of August, 2013.

s/Steven A. Wagner
Steven A. Wagner
Georgia Bar No. 000529
EEOC - Atlanta District Office
100 Alabama St., SW, Suite 4R30
Atlanta, Georgia 30303
Telephone:  (404) 562-6897
Facsimile:  (404) 562-6905
E-mail: steven.wagner@eeoc.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, and | ) ) | |
| CONTRICE TRAVIS, | ) ) | CIVIL ACTION<br>FILE NO.:  1:10-CV-03132-SCJ |
| Plaintiff-Intervenor, | ) ) | |
| v. | ) ) | |
| EXEL INC., | ) ) | |
| Defendant. | ) | |

## CERTIFICATION OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel certifies that this Response in Opposition to Defendant Exel Inc.'s Renewed Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial was prepared using Times New Roman 14-point font.

This 9th day of August, 2013.

s/Steven A. Wagner
Steven A. Wagner
Georgia Bar No. 000529

EEOC - Atlanta District Office
100 Alabama St., SW, Suite 4R30
Atlanta, Georgia 30303
Telephone:  (404) 562-6897
Facsimile:  (404) 562-6905
E-mail: steven.wagner@eeoc.gov

45

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, and | ) ) | |
| CONTRICE TRAVIS, | ) ) | CIVIL ACTION FILE NO.:  1:10-CV-03132-SCJ |
| Plaintiff-Intervenor, | ) ) | |
| v. | ) ) | |
| EXEL INC., | ) ) | |
| Defendant. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of the foregoing **Response in Opposition to Defendant Exel Inc.'s Renewed Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial** by filing the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record:

David R. Kresser, Esq.
***Counsel for Defendant***

Rudjard M. Hayes, Esq.
***Counsel for Plaintff-Intervenor***

46

This 9th day of August, 2013.

s/Steven A. Wagner
Steven A. Wagner
Georgia Bar No. 000529

EEOC - Atlanta District Office
100 Alabama St., SW, Suite 4R30
Atlanta, Georgia 30303
Telephone:  (404) 562-6897
Facsimile:  (404) 562-6905
E-mail: steven.wagner@eeoc.gov
